[No. B092824. Second Dist., Div. Three. Aug. 26, 1997.]

SONDRA LOCKE et al., Plaintiffs and Appellants, v.
WARNER BROS., INC., Defendant and Respondent.

**COUNSEL**

Peggy Garrity for Plaintiffs and Appellants.

O'Melveny & Myers, M. Randall Oppenheimer, Robert M. Schwartz and Nancy E. Sussman for Defendant and Respondent.

**OPINION**

**KLEIN, P. J.**—Plaintiffs and appellants Sondra Locke (Locke) and Caritas Films, a California corporation (Caritas) (sometimes collectively referred to as Locke) appeal a judgment following a grant of summary judgment in favor of defendant and respondent Warner Bros., Inc. (Warner).

The essential issue presented is whether triable issues of material fact are present which would preclude summary judgment.

We conclude triable issues are present with respect to whether Warner breached its development deal with Locke by categorically refusing to work with her, and whether Warner fraudulently entered into said agreement without the intention to work with Locke. The judgment therefore is reversed as to the second and fourth causes of action and otherwise is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Locke's dispute with Eastwood.*

In 1975, Locke came to Warner to appear with Clint Eastwood in THE OUTLAW JOSEY WALES (Warner Bros. 1976). During the filming of the movie, Locke and Eastwood began a personal and romantic relationship. For

the next dozen years, they lived in Eastwood's Los Angeles and Northern California homes. Locke also appeared in a number of Eastwood's films. In 1986, Locke made her directorial debut in RATBOY (Warner Bros. 1986).

In 1988, the relationship deteriorated, and in 1989 Eastwood terminated it. Locke then brought suit against Eastwood, alleging numerous causes of action. That action was resolved by a November 21, 1990, settlement agreement and mutual general release. Under said agreement, Eastwood agreed to pay Locke additional compensation in the sum of $450,000 "on account of past employment and Locke's contentions" and to convey certain real property to her.

### 2. *Locke's development deal with Warner.*

According to Locke, Eastwood secured a development deal for Locke with Warner in exchange for Locke's dropping her case against him. Contemporaneously with the Locke/Eastwood settlement agreement, Locke entered into a written agreement with Warner, dated November 27, 1990. It is the Locke/Warner agreement which is the subject of the instant controversy.

The Locke/Warner agreement had two basic components. The first element states Locke would receive $250,000 per year for three years for a "non-exclusive first look deal." It required Locke to submit to Warner any picture she was interested in developing before submitting it to any other studio. Warner then had 30 days either to approve or reject a submission.

The second element of the contract was a $750,000 "pay or play" directing deal. The provision is called "pay or play" because it gives the studio a choice: It can either "play" the director by using the director's services, or pay the director his or her fee.

Unbeknownst to Locke at the time, Eastwood had agreed to reimburse Warner for the cost of her contract if she did not succeed in getting projects produced and developed. Early in the second year of the three-year contract, Warner charged $975,000 to an Eastwood film, UNFORGIVEN (Warner Bros. 1992).

Warner paid Locke the guaranteed compensation of $1.5 million under the agreement. In accordance with the agreement, Warner also provided Locke with an office on the studio lot and an administrative assistant. However, Warner did not develop any of Locke's proposed projects or hire her to direct any films. Locke contends the development deal was a sham, that Warner never intended to make any films with her, and that Warner's sole

motivation in entering into the agreement was to assist Eastwood in settling his litigation with Locke.

### 3. *Locke's action against Warner.*

On March 10, 1994, Locke filed suit against Warner, alleging four causes of action.

The first cause of action alleged sex discrimination in violation of public policy. Locke alleged Warner denied her the benefit of the bargain of the development deal on account of her gender.

The third cause of action, captioned "Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing in Violation of Public Policy," alleged a similar claim. Locke pled that in denying her the benefits of the Warner/Locke agreement, Warner was "motivated by [its] discriminatory bias against women in violation of . . . public policy."[1]

The second cause of action alleged that Warner breached the contract by refusing to consider Locke's proposed projects and thereby deprived her of the benefit of the bargain of the Warner/Locke agreement.

Lastly, the fourth cause of action alleged fraud. Locke pled that at the time Warner entered into the agreement with her, it concealed and failed to disclose it had no intention of honoring the agreement.

Warner answered, denied each and every allegation and asserted various affirmative defenses.

### 4. *Warner's motion for summary judgment and opposition thereto.*

On January 6, 1995, Warner filed a motion for summary judgment. Warner contended it did not breach its contract with Locke because it did consider all the projects she presented, and the studio's decision not to put any of those projects into active development or "hand" Locke a script which it already owned was not a breach of any express or implied contractual duty. Warner asserted the odds are slim a producer can get a project into development and even slimmer a director will be hired to direct a film. During the term of Locke's deal, Warner had similar deals with numerous other producers and directors, who fared no better than Locke.

---

[1]We construe both the first and third causes of action as purporting to allege a claim for tortious wrongful discharge in violation of the public policy against sex discrimination. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665-671 [254 Cal.Rptr. 211, 765 P.2d 373]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88-91 [276 Cal.Rptr. 130, 801 P.2d 373].)

As for Locke's sex discrimination claims, Warner averred there was no evidence it ignored Locke's projects or otherwise discriminated against her on account of her gender. Finally, Warner urged the fraud claim was meritless because Locke had no evidence that when Warner signed the contract, it did not intend to honor the deal, and moreover, Warner had fulfilled its contractual obligations to Locke.

In opposing summary judgment, Locke contended Warner breached the agreement in that it had no intention of accepting any project regardless of its merits. Locke also asserted Warner committed fraud by entering into the agreement without any intention of approving any project with Locke or allowing Locke to direct another film.

Locke's opposition papers cited the deposition testimony of Joseph Terry, who recounted a conversation he had with Bob Brassel, a Warner executive, regarding Locke's projects. Terry had stated to Brassel: " 'Well, Bob, this woman has a deal on the lot. She's a director that you want to work with. You have a deal with her. . . . I've got five here that she's interested in.' [¶] And then I would get nothing. [¶] . . . [¶] I was told [by Brassel], 'Joe, we're not going to work with her,' and then, 'That's Clint's deal.' And that's something I just completely did not understand."

Similarly, the declaration of Mary Wellnitz stated: She worked with Locke to set up projects at Warner, without success. Shortly after she began her association with Locke, Wellnitz submitted a script to Lance Young, who at the time was a senior vice-president of production at Warner. After discussing the script, Young told Wellnitz, "Mary, I want you to know that I think Sondra is a wonderful woman and very talented, but, if you think I can go down the hall and tell Bob Daly that I have a movie I want to make with her he would tell me to forget it. They are not going to make a movie with her here."

5. *Trial court's ruling.*

On February 17, 1995, the trial court granted summary judgment in favor of Warner. Thereafter, the trial court signed an extensive order granting summary judgment. The order stated:

"Under the contract, Warner had no obligation either to put into development any of the projects submitted to the studio for its consideration, or to 'hand off' to Locke any scripts for her to direct that it previously had acquired from someone else. The implied covenant of good faith and fair dealing cannot be imposed to create a contract different from the one the

parties negotiated for themselves. Warner had the option to pass on each project Locke submitted. Warner was not required to have a 'good faith' or 'fair' basis for declining to exercise its right to develop her material. Such a requirement would be improper and unworkable. A judge or jury cannot and should not substitute its judgment for a film studio's when the studio is making the creative decision of whether to develop or produce a proposed motion picture. Such highly subjective artistic and business decisions are not proper subjects for judicial review. Moreover, Warner had legitimate commercial and artistic reasons for declining to develop the projects Locke submitted."

With respect to Locke's claim she was defrauded by Warner when it entered into the agreement with the undisclosed intention not to honor its contractual obligations, the trial court ruled that because Warner did not breach its contractual obligations to Locke, the fraud claim was meritless. Also, it could not be inferred from the statements by Young and Brassel that two years earlier, when Warner entered into agreement, it had no intention of working with Locke.

As for the two causes of action alleging sex discrimination, the trial court found no evidence Warner declined to develop the projects Locke submitted, and declined to use her directing services, on account of her gender.

Locke filed a timely notice of appeal from the judgment.

### CONTENTIONS

Locke contends: The trial court erred by granting Warner's motion for summary judgment based on its conclusion there were no disputed issues of material fact; the trial court erred in weighing the evidence, resolving doubts against Locke, the nonmoving party, and adopting only those inferences favorable to Warner where the evidence supported contrary inferences; and the trial court committed reversible error first by failing to make any findings or evidentiary rulings and then by adopting Warner's defective ruling.

### DISCUSSION

1. *Standard of appellate review.*

As we recently stated in *PMC, Inc.* v. *Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 590 [52 Cal.Rptr.2d 877], summary judgment "motions are to expedite litigation and eliminate needless trials. [Citation.]

They are granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citations.]"

■ A defendant meets its burden upon such a motion if it negates an essential element of the plaintiff's cause of action, or establishes a complete defense, or if it demonstrates the absence of evidence to support the plaintiff's case. Once the moving defendant has met its initial burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists. (*PMC, Inc.* v. *Saban Entertainment, Inc., supra,* 45 Cal.App.4th at p. 590; *Leslie G.* v. *Perry & Associates* (1996) 43 Cal.App.4th 472, 482 [50 Cal.Rptr.2d 785].)

■ On appeal, "we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court . . . .' [Citations.] '[W]e construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' [Citations.]" (*PMC, Inc.,* v. *Saban Entertainment, Inc., supra,* 45 Cal.App.4th at p. 590.)

Our review is guided by the foregoing principles.[2]

2. *A triable issue exists as to whether Warner breached its contract with Locke by failing to evaluate Locke's proposals on their merits.*

■ As indicated, the second cause of action alleged Warner breached the contract by "refusing to consider the projects prepared by [Locke] and

---

[2]Warner interposed extensive evidentiary objections, including objections to portions of Wellnitz's declaration and Terry's deposition testimony. However, we specifically note the absence of any objection by Warner to Terry's statement, "I was told, 'Joe, we're not going to work with her,' and then, 'That's Clint's deal.' " Also, the only objection below to Wellnitz's assertion that Young told her "if you think I can go down the hall and tell Bob Daly that I have a movie I want to make with her he would tell me to forget it. They are not going to make a movie with her here," is that Young's statement was irrelevant. The trial court disposed of all the objections by ruling: "To the extent the parties' evidentiary objections are pertinent to the Court's decision on the motion for summary judgment, the defendant's evidentiary objections are sustained and the plaintiffs' objections are overruled." This sweeping ruling was erroneous because, inter alia, the relevancy objection was meritless and should have been overruled. Therefore, the subject statements are properly before this court.

depriving [Locke] of the benefit of the bargain of the Warner-Locke agreement."[3]

In granting summary judgment on this claim, the trial court ruled "[a] judge or jury cannot and should not substitute its own judgment for a film studio's when the studio is making the creative decision of whether to develop or produce a proposed motion picture. Such highly-subjective artistic and business decisions are not proper subjects for judicial review."

The trial court's ruling missed the mark by failing to distinguish between Warner's right to make a subjective creative decision, which is not reviewable for reasonableness, and the requirement the dissatisfaction be bona fide or genuine.

a. *General principles.*

" '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' [Citations.]" (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 923 [216 Cal.Rptr. 345, 702 P.2d 503]; accord, *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500 [220 Cal.Rptr. 818, 709 P.2d 837].) It is settled that in " 'every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . .' " (*Kendall, supra,* at p. 500; accord, *Waller,* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 36.)

Therefore, when it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of *honest satisfaction* is applicable. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 729, p. 659; Rest.2d Contracts, § 228, coms. a, b, pp. 182-183.) "Where the contract involves matters of fancy, taste or judgment, the promisor is the sole judge of his satisfaction. If he asserts *in good faith* that he is not satisfied, there can be no inquiry into the reasonableness of his attitude. [Citations.] [¶] Traditional examples are employment contracts . . . and agreements to paint a portrait, write a literary or

---

[3]Contrary to Warner's contention Locke is raising an unpled claim for breach of the implied covenant of good faith and fair dealing, the second cause of action for breach of contract adequately alleges Warner deprived Locke of the benefit of the bargain of the development deal by refusing to consider her projects. Such conduct by Warner, if proven, would amount to a breach of the covenant, implied "in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. [Citation.]" (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883]; accord, *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

scientific article, or produce a play or vaudeville act. [Citations.]" (1 Witkin, Summary of Cal. Law, *supra*, § 730, p. 660; accord, *Schuyler* v. *Pantages* (1921) 54 Cal.App. 83, 85-87 [201 P. 137].) In such cases, "the promisor's determination that he is not satisfied, *when made in good faith*, has been held to be a defense to an action on the contract. [Citations.]" (*Mattei* v. *Hopper* (1958) 51 Cal.2d 119, 123 [330 P.2d 625], italics added.)

 Therefore, the trial court erred in deferring entirely to what it characterized as Warner's "creative decision" in the handling of the development deal. If Warner acted in bad faith by categorically rejecting Locke's work and refusing to work with her, irrespective of the merits of her proposals, such conduct is not beyond the reach of the law.

> b. *Locke presented evidence from which a trier of fact reasonably could infer Warner breached the agreement by refusing to consider her proposals in good faith.*

Merely because Warner paid Locke the guaranteed compensation under the agreement does not establish Warner fulfilled its contractual obligation. As pointed out by Locke, the value in the subject development deal was not merely the guaranteed payments under the agreement, but also the opportunity to direct and produce films and earn additional sums, and most importantly, the opportunity to promote and enhance a career.

Unquestionably, Warner was entitled to reject Locke's work based on its subjective judgment, and its creative decision in that regard is not subject to being second-guessed by a court. However, bearing in mind the requirement that subjective dissatisfaction must be an honestly held dissatisfaction, the evidence raises a triable issue as to whether Warner breached its agreement with Locke by not considering her proposals on their merits.

As indicated, the deposition testimony of Joseph Terry recounted a conversation he had with Bob Brassel, a Warner executive, regarding Locke's projects. In that conversation, Brassel stated " 'Joe, we're not going to work with her,' and then, 'That's Clint's deal.' "

Similarly, the declaration of Mary Wellnitz recalled a conversation she had with Lance Young, a senior vice-president of production at Warner. After discussing the script with Wellnitz, Young told her: "Mary, I want you to know that I think Sondra is a wonderful woman and very talented, but, if

you think I can go down the hall and tell Bob Daly that I have a movie I want to make with her he would tell me to forget it. They are not going to make a movie with her here."

The above evidence raises a triable issue of material fact as to whether Warner breached its contract with Locke by categorically refusing to work with her, irrespective of the merits of her proposals. While Warner was entitled to reject Locke's proposals based on its subjective dissatisfaction, the evidence calls into question whether Warner had an honest or good faith dissatisfaction with Locke's proposals, or whether it merely went through the motions of purporting to "consider" her projects.

c. *No merit to Warner's contention Locke seeks to rewrite the instant agreement to limit Warner's discretionary power.*

Warner argues that while the implied covenant of good faith and fair dealing is implied in all contracts, it is limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated in the contract. (*Racine & Laramie, Ltd.* v. *Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1032 [14 Cal.Rptr.2d 335].)

This principle is illustrated in *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 351-352 [6 Cal.Rptr.2d 467, 826 P.2d 710], wherein the parties entered into a lease agreement which stated that if the tenant procured a potential sublessee and asked the landlord for consent to sublease, the landlord had the right to terminate the lease, enter into negotiations with the prospective sublessee, and appropriate for itself all profits from the new arrangement. *Carma* recognized "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." (*Id.,* at p. 372.) The court expressed the view that "[s]uch power must be exercised in good faith." (*Ibid.*) At the same time, *Carma* upheld the right of the landlord under the express terms of the lease to freely exercise its discretion to terminate the lease in order to claim for itself—and deprive the tenant of—the appreciated rental value of the premises. (*Id.,* at p. 376.)

In this regard, *Carma* stated: "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary

express terms. [Citations.] 'The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." 3 Corbin, Contracts, § 564, p. 298 (1960). . . . [¶] *As to acts and conduct authorized by the express provisions of the contract*, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.' [Citation.]" (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc., supra*, 2 Cal.4th at p. 374, italics added.)

In *Third Story Music, Inc.* v. *Waits* (1995) 41 Cal.App.4th 798, 801 [48 Cal.Rptr.2d 747], the issue presented was "whether a promise to market music, or to refrain from doing so, at the election of the promisor is subject to the implied covenant of good faith and fair dealing where substantial consideration has been paid by the promisor."

In that case, Warner Communications obtained from Third Story Music (TSM) the worldwide right to manufacture, sell, distribute and advertise the musical output of singer/songwriter Tom Waits. (*Third Story Music, Inc.* v. *Waits, supra*, 41 Cal.App.4th at pp. 800-801.) The agreement also specifically stated that Warner Communications " 'may at our election refrain from any or all of the foregoing.' " (*Id.*, at p. 801.) TSM sued Warner Communications for contract damages based on breach of the implied covenant of good faith and fair dealing, claiming Warner Communications had impeded TSM's receiving the benefit of the agreement. (*Id.*, at p. 802.) Warner Communications demurred to the complaint, alleging the clause in the agreement permitting it to " 'at [its] election refrain' from doing anything to profitably exploit the music is controlling and precludes application of any implied covenant." (*Ibid.*) The demurrer was sustained on those grounds. (*Ibid.*)

The reviewing court affirmed, holding the implied covenant was unavailing to the plaintiff. (*Third Story Music, Inc.* v. *Waits, supra*, 41 Cal.App.4th at pp. 808-809.) Because the agreement *expressly* provided Warner Communications had the right to *refrain* from marketing the Waits recordings, the implied covenant of good faith and fair dealing did not limit the discretion given to Warner Communications in that regard. (*Ibid.*; *Carma Developers*

*(Cal.), Inc.* v. *Marathon Development California, Inc., supra,* 2 Cal.4th at p. 374.)

Warner's reliance herein on *Third Story Music, Inc.,* is misplaced. The Locke/Warner agreement did not give Warner the express right to refrain from working with Locke. Rather, the agreement gave Warner *discretion* with respect to developing Locke's projects. The implied covenant of good faith and fair dealing obligated Warner to exercise that discretion honestly and in good faith.

In sum, the Warner/Locke agreement contained an implied covenant of good faith and fair dealing, that neither party would frustrate the other party's right to receive the benefits of the contract. (*Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 658; *Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 36.) Whether Warner violated the implied covenant and breached the contract by categorically refusing to work with Locke is a question for the trier of fact.

3. *A triable issue exists as to whether Warner made a fraudulent promise.*

In the fourth cause of action, Locke pled at the time Warner entered into the agreement with her, it concealed and failed to disclose it had no intention of honoring the agreement.[4]

The trial court held that because Warner did not breach any express or implied obligations owed to Locke, she could not prevail on the fraud claim. However, as explained above, a triable issue exists as to whether Warner breached the agreement with Locke. Therefore, the trial court's rationale for disposing of the fraud claim is undermined.

The trial court also ruled Locke could not prevail on the fraud claim because there was no evidence Warner had a fraudulent intent at the time the parties entered into the contract. The trial court acknowledged Locke "filed a declaration of her development assistant, Mary Wellnitz, in which Ms.

[4]Although Warner contends Locke has an unalleged claim for fraudulent concealment, the fourth cause of action adequately pled a cause of action for fraud. In addition to pleading a promise was made and was not fulfilled, Locke alleged Warner did not intend to perform when it made the promise. (Civ. Code, § 1710, subd. 4; *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 685, pp. 786-787.)

Wellnitz states that a Warner Bros. executive, Lance Young, remarked in late 1992 that Warner Bros. was 'not going to make a movie' with Ms. Locke. [Locke] also offered the deposition testimony of a third party, Joe Terry, in which he recalled a 1993 conversation with another Warner Bros. production executive, Bob Brassel, in which Mr. Brassel said that the studio was not going to work with Ms. Locke. However, the Court does not believe that these statements would permit a jury to infer that two years earlier, when plaintiffs and the defendant entered into their contract, Warner Bros. intended to breach its obligations."

We disagree. Fraudulent intent must often be established by circumstantial evidence, and may be "inferred from such circumstances as defendant's . . . failure even to attempt performance, . . ." (*Tenzer* v. *Superscope, Inc.*, *supra*, 39 Cal.3d at p. 30.) Based on the above evidence that Warner had expressed an absolute unwillingness to work with Locke, a trier of fact reasonably could infer Warner never intended to give Locke's proposals a good faith evaluation and that Warner entered into the agreement with Locke solely as an accommodation to Eastwood, who had promised to reimburse Warner for any losses under the agreement. The trial court erred in concluding such an inference could not be drawn from the evidence. We conclude the issue of fraudulent intent is one for the trier of fact.

4. *Locke waived any error in the trial court's ruling with respect to her causes of action alleging gender bias.*

Locke's opening brief does not assert any error in the trial court's disposition of her two causes of action alleging sex discrimination. Accordingly, this court may treat the claims as having been waived.

Belatedly, Locke's reply brief contends she presented evidence which raised the inference she was discriminated against because of her gender. "Ordinarily, [appellants'] failure to raise an issue in their opening brief waives the issue on appeal. [Citation.]" (*Tisher* v. *California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361 [282 Cal.Rptr. 330]; accord, *1119 Delaware* v. *Continental Land Title Co.* (1993) 16 Cal.App.4th 992, 1004 [20 Cal.Rptr.2d 438]; *Regency Outdoor Advertising, Inc.* v. *Carolina Lanes, Inc.* (1995) 31 Cal.App.4th 1323, 1333 [37 Cal.Rptr.2d 552].) Locke has not shown good cause for the untimely contention. Therefore, we disregard Locke's argument the trial court erred in granting summary judgment on the first and third causes of action.

## 5. *Remaining issues not reached.*

Because we find triable issues are present with respect to the second and fourth causes of action, it is unnecessary to address Locke's remaining contentions.

## DISPOSITION

The judgment is reversed with respect to the second and fourth causes of action and is otherwise affirmed. Locke to recover costs on appeal.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied September 24, 1997, and respondent's petition for review by the Supreme court was denied November 19, 1997.