MARSU, B.V., Plaintiff–Counterdefendant–Appellee,

v.

The WALT DISNEY COMPANY, Defendant–Counterclaimant–Appellant.

Nos. 97–56547, 98–56151.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 2, 1999

Memorandum Filed March 25, 1999

Order and Opinion Filed July 28, 1999

934

Michael A. Cardozo, Proskauer Rose, New York, New York, and Henry Ben-Zvi, Belin Rawlings & Badal, Los Angeles, California, for the defendant-counterclaim-ant-appellant.

Patricia L. Glaser, Sean Riley, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Los Angeles, California, for the plaintiff-counterdefendant-appellee.

Before: PREGERSON and RYMER, Circuit Judges, and PRO,[1] District Judge.

## ORDER

The Memorandum disposition filed March 25, 1999 is redesignated as an authored Opinion by Judge Harry Pregerson.

1. The Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

## OPINION

PREGERSON, Circuit Judge:

### I.

On August 14, 1990, Marsu B.V. and The Walt Disney Company entered into an agreement (the "Agreement") that gave Disney the exclusive right to exploit worldwide "Marsupilami," a cartoon character owned by Marsu. Historically, Marsupilami had been marketed, without supporting television exposure, in France, Belgium, and Germany in French-language comic books. In 1989, the year before Marsu entered into its Agreement with Disney, Marsupilami had generated revenues up to $1.2 million, and its projected revenue for 1990 was $2 million. Given the 1990 projected revenue, Disney agreed to pay Marsu a minimum of $2 million a year during the Agreement's five-year term. But Disney told Marsu that based on Disney's strength and expertise "significantly higher revenues" could be expected.

Under the Agreement, Disney was to develop maximum public awareness of Marsupilami by broadcasting in the United States half-hour animated films on network television coordinated with a broad merchandising campaign. To that end, Disney was required (1) to make thirteen half-hour animated films featuring Marsupilami by December 31, 1993; (2) to employ its "best efforts" to secure a television network commitment to air the half-hour animated films; and (3) to aggressively expand the market for Marsupilami by entering into licensing agreements with third parties to merchandise Marsupilami products. Disney paid Marsu $500,000 upon signing the Agreement and agreed to pay Marsu the annual guarantee of $2 million beginning January 1, 1992 until the Agreement expired or was terminated.

Contrary to the terms of the Agreement, Disney did not produce the thirteen half-hour animated films or use its "best efforts" to secure a commitment from a television network to air the animated films. Instead, in February 1991, Disney convinced Marsu to accept a "roll-out" strategy that contemplated a slower and more incremental release of Marsupilami animations by producing a number of six to eight minute "shorts" rather than thirteen half-hour animated films. Disney told Marsu that the roll-out strategy was the only way to get television networks to air Marsupilami animations. But while convincing Marsu to accept the roll-out strategy, Disney never revealed that no Disney official had ever asked any television network to air half-hour Marsupilami animations.

With respect to its merchandising obligation, Disney did enter into several licensing agreements with third parties to merchandise Marsupilami products. But the merchandising campaign failed because Disney did not launch the campaign in coordination with television broadcasts of Marsupilami animations. What Disney did was launch a merchandising campaign in June 1993, *nine months after* the first animation "shorts" were broadcast on network television and *three months before* the second animation "shorts" were broadcast. One reason Disney failed to properly handle the Marsupilami merchandise campaign was that it placed the campaign in the hands of junior and inexperienced executives.

But the primary reason for the merchandising campaign's failure was Disney's preoccupation with exploiting more profitable animated characters, such as "Aladdin" and the "Little Mermaid." In an October 1992 draft memo to Disney's chief executive officer, a ranking Disney official on the Marsupilami project talked about whether Disney should exercise its option to terminate the Agreement with Marsu in light of Disney's unexpected success with other "hot properties," such as "Aladdin" and the "Little Mermaid." The memo states that these properties were consuming all of Disney's time and resources and making it impossible to "do Marsu right." The memo recognized that Marsupilami was getting a cold reception because it had "less Disney weight behind it" than other hot properties.

But it was not until December 27, 1993–fifteen months after the October 1992 memo was circulated-that Disney gave Marsu 180 days notice that it was terminating the Agreement. Disney's notice came four days before its obligation to produce the thirteen half-hour animated films featuring Marsupilami was to become due. After giving notice of termination, Disney waived guarantees merchandising sublicensees owed Disney. Pursuant to the 180–day notice, the Agreement terminated effective June 30, 1994. By that time, Disney had paid Marsu a total of $5.5 million, almost exclusively in payments of the annual $2 million guarantees Disney owed Marsu under the Agreement.[2]

Marsu sued Disney claiming: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraudulent inducement; and (4) fraudulent concealment. Disney counterclaimed for breach of contract and accounting. After a two-week bench trial before Senior District Court Judge Edward Rafeedie, the court concluded that Disney had breached certain express provisions of the Agreement and had breached the implied covenant of good faith and fair dealing. The court also determined that Disney had committed fraudulent concealment. The court awarded Marsu $8,015,400 in lost profits. It also awarded Marsu $431,159, the amount Marsu would have received in guarantees from sublicensees had Disney not waived the guarantees.

We affirm the district court on the limited grounds that Disney breached the Agreement and also breached the implied covenant of good faith and fair dealing. We also affirm the district court's determination that Marsu did not breach any contractual obligation it owed Disney. Finally, we affirm the district court's award of damages and attorneys' fees to Marsu.

## II.

■ We review a district court's findings of fact for clear error and its legal conclusions de novo. *See Price v. United States Navy,* 39 F.3d 1011, 1021 (9th Cir. 1994).

## III.

■ The district court concluded that Disney breached two express provisions of its Agreement with Marsu: (1) its obligation to produce thirteen half-hour animated films featuring Marsupilami by December 31, 1993; and (2) its obligation to employ its "best efforts" to secure television network commitment to air the half-hour animated films. Disney argues that it did not breach its animation obligation because it gave notice that it was terminating the Agreement before its obligation to complete the animated films became due. In the alternative, Disney argues that it met this obligation under the "roll-out" strategy.

The district court rejected both arguments. The district court correctly determined that Disney's obligation to meet its animation obligations "accrued on December 31, 1993. Disney's notice of termination on December 27, 1993, did not operate to relieve Disney of its animation obligation, as the actual termination did not occur until June 30, 1994." The court also found that the "shorts" produced under the "roll-out" strategy did not satisfy Disney's animation obligation because the films did not feature Marsupilami. Nothing in the record suggests that this finding was clearly erroneous.

■ The record also supports the district court's determination that Disney breached its obligation to employ its "best efforts" to secure a television network commitment to broadcast the half-hour Marsupilami animations. Trial testimony showed that Disney *never asked the net-*

---

**2.** Disney paid Marsu $5 million in guarantees. Disney paid Marsu the additional $500,000 upon signing the Agreement.

*works* to air half-hour Marsupilami animated films as required under the Agreement before convincing Marsu to accept a "roll-out" strategy. In addition, the district court determined that the "roll-out" strategy did not "amount to an exercise of best efforts." We agree.

## IV.

■ The district court also determined that Disney breached the implied covenant of good faith and fair dealing by employing junior and inexperienced executives to merchandise Marsupilami products, by mistiming the launch of the Marsupilami merchandise campaign, and by waiving guarantees under merchandising licensing agreements.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 371, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992) (quoting Restatement (Second) of Contracts § 205). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id.* at 372, 6 Cal.Rptr.2d 467, 826 P.2d 710.

The record supports the district court's conclusion that Disney breached the implied covenant of good faith and fair dealing with respect to its obligation to merchandise Marsupilami. An aggressive merchandising campaign coordinated with television animation was the lynchpin of the Agreement. But Disney launched its Marsupilami merchandising campaign at a time when no Marsupilami animation was being broadcast on network television. Disney's own expert testified that no one "in their right mind" would launch a merchandise campaign three months before the featured character appeared on television. The record also shows that Disney used junior employees with minimal or no prior experience in merchandising to formulate the marketing, promotional, and merchandising plan for Marsupilami.

The most persuasive evidence of Disney's failure to merchandise Marsupilami in good faith is the internal draft memo of October 1992 by a ranking Disney executive on the Marsupilami project. That memo indicates that Disney failed to exploit Marsupilami fully because it was preoccupied with other "hot properties." The memo to Disney's chief executive officer stated, among other things:

● "Our hot properties were consuming all of our attention (film properties alone will be $25 million over budget this year!!!). *We couldn't divert attention from these major hits to do Marsu.*"

● Our film properties have turned into an embarrassment of riches in licensing. We have more than enough to do to stay busy for years into the future. *Internationally, we have neither the time nor the resources to do Marsu right-we'd be leaving millions of lost opportunity on film merchandise potentially on the table.*

● The reception Marsu is receiving from licensees outside the gift category has been very cool. Compared to Aladdin ... Marsu is a greater unknown *and has less Disney weight behind it. If we didn't have the killer film properties, the reception would be different* .... [Marsu] appeared to be doing better with [its] property than we're able to do, but again that is because *we have lots of other Disney priorities, more important both financially and strategically.*

(Emphasis added).

■ We reject Disney's argument that it did not breach the implied covenant of good faith and fair dealing because it fulfilled its express merchandising obligations to enter into certain kinds of licensing agreements. A "breach of a specific provision of the contract is not a necessary prerequisite" to a breach of an implied covenant of good faith and fair dealing. *Carma,* 2 Cal.4th at 373, 6 Cal. Rptr.2d 467, 826 P.2d 710. "[T]he cove-

nant is implied ... to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract." *Los Angeles Equestrian Ctr., Inc. v. City of Los Angeles,* 17 Cal.App.4th 432, 447, 21 Cal.Rptr.2d 313 (1993).

■ We further reject Disney's contention that it satisfied its duties under the Agreement merely by paying Marsu the minimum guarantees. A similar argument was rejected in *Locke v. Warner Bros., Inc.,* 57 Cal.App.4th 354, 364, 66 Cal.Rptr.2d 921 (1997) ("Merely because Warner paid Locke the guaranteed compensation under the Agreement does not establish Warner fulfilled its contractual obligation.").

■ Before trial, the district court ruled on summary judgment that Disney's waiver of the guarantees from sublicensees was not a breach of an *express* provision of the Agreement. Based on this ruling, Disney argues that the district court erred by determining that the same waiver breached the *implied* covenant of good faith and fair dealing. But Disney's argument is misplaced. It is well-settled that "breach of a specific provision of the contract is not a necessary prerequisite" to a breach of an implied covenant. *Carma,* 2 Cal.4th at 373, 6 Cal.Rptr.2d 467, 826 P.2d 710.

### V.

The district court also concluded that Disney fraudulently concealed material facts from Marsu. We need not address this issue here because we affirm the district court's determination that Disney breached the Agreement and the implied covenant of good faith and fair dealing. Marsu is entitled to damages based upon these theories alone.

### VI.

The district court found that "Marsu has paid to Disney and properly accounted to Disney for all of the French language publishing royalties owed under the Contract" and granted summary judgment to Marsu on Disney's counterclaim that Marsu owed Disney $19,727 in royalties for French language publishing. Disney has offered no evidence to contest this finding. Accordingly, we affirm.

### VII.

■ The district court considered several possible theories for determining damages. These theories were presented through expert testimony offered by both sides. The court ultimately crafted its own formula to calculate the damages based upon a revised and reduced version of the "European damages approach" presented by Marsu's expert. To calculate Marsu's "lost profit" damages for worldwide exploitation, the court first doubled the royalties that Marsu earned from Marsupilami prior to the Agreement, at which time Marsupilami had been exposed only to half of the entire European market. Then the court multiplied the total European revenue by five, because Europe represents one-fifth of the world market. From that figure, the court subtracted Disney's 20% fee and Disney's paid-out advances and adjusted the figure by a 4% per annum growth figure to reach $8,015,400. Finally, the court added the $431,159 in merchandising guarantees that would have been due Marsu but for Disney's waiver of the guarantees owed under merchandising licensing agreements. The damages totaled $8,446,559.

■ We review a district court's computation of damages for clear error. *See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,* 16 F.3d 1032, 1038–1039 (9th Cir.1994). We "will not disturb an award of damages unless it is clearly unsupported by the evidence." *Stinnett v. Damson Oil Corp.,* 813 F.2d 1394, 1398 (9th Cir.1987).

■ "It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party." *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.,* 1 Cal.3d 586, 599, 83 Cal.Rptr. 418, 463 P.2d 770 (1970). "The law requires only that some reason-

able basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where ... it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits." *GHK Assoc. v. Mayer Group, Inc.*, 224 Cal.App.3d 856, 873, 274 Cal.Rptr. 168 (1990) (citations omitted). "[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *California Lettuce Growers v. Union Sugar Co.*, 45 Cal.2d 474, 487, 289 P.2d 785 (1955).

There is nothing in the record to suggest that the district court clearly erred in determining damages. To the contrary, it is clear that the district court exercised its discretion by declining to award compensation where it felt calculations were impermissibly speculative. In fact, the damage amount determined by the district court appears reasonable under the circumstances. Accordingly, we affirm the district court's damage award of $8,446,559 to Marsu.

## VIII.

The district court awarded Marsu all of the attorneys' fees it had reasonably incurred in the litigation in the amount of $928,176.75. We review a district court's award of attorneys' fees for abuse of discretion. *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1498 (9th Cir.1995).

We reject Disney's argument that the district court erred by awarding attorneys' fees for Marsu's tort claims. The language of the attorneys' fees provision in the Agreement is broad enough to encompass Marsu's tort claims. The parties agreed that *"[a]ny dispute, difference, claim or counterclaim between the parties arising out of or in connection with this agreement* shall be submitted to state or federal court.... The prevailing party in *any action* hereunder shall be entitled to recover ... reasonable attorneys' fees." Agreement ¶26 (emphasis added). This provision applies to Marsu's tort claims because they arise "out of or in connection with" the contract. *See Lerner v. Ward*, 13 Cal.App.4th 155, 160, 16 Cal.Rptr.2d 486 (1993) (construing attorneys' fees provision for claims "arising out of this Agreement" to encompass tort claims).

We also reject Disney's argument that the district court should have apportioned the attorneys' fees award because Marsu did not prevail on all of its claims. A court will award attorneys' fees for "claims upon which the plaintiff failed to prevail [but] were *related to* the plaintiff's successful claims." *Odima*, 53 F.3d at 1499 (emphasis added). "[R]elated claims will involve a common core of facts." *Id.* Here, Marsu's unsuccessful fraudulent inducement and accounting claims were based upon the same common core of facts as its successful claims of breach of contract and breach of the implied covenant of good faith and fair dealing. Thus, the district court did not abuse its discretion in awarding Marsu all of the attorneys' fees it requested.

AFFIRMED.