[No. B205091. Second Dist., Div. Six. Mar. 16, 2009.]

PEAK-LAS POSITAS PARTNERS, Plaintiff and Respondent, v. MICHAEL BOLLAG, Defendant and Appellant.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Counsel

White & Case, Dan Woods, Sayema J. Hameed and Jill A. Martin for Defendant and Appellant.

Price, Postel & Parma, J. Terry Schwartz and Timothy E. Metzinger for Plaintiff and Respondent.

Opinion

GILBERT, P. J.—Parties agree to act reasonably in their contractual relationship. This case demonstrates that when a party acts unreasonably, it is reasonably certain that no one prospers.

Michael Bollag appeals a judgment extending the escrow on a land sale contract so that buyer Peak-Las Positas Partners (PLP) can obtain a lot line adjustment for a housing project. The trial court found that Bollag acted unreasonably in refusing to extend the escrow after PLP paid most of the purchase price and incurred about $5 million in costs for the lot line adjustment. PLP also received attorney's fees and costs. We affirm.

*Facts*

PLP, a general partnership, owns and plans to develop a 10-acre parcel near Las Positas Road in Santa Barbara. Bollag owns the adjoining 86-acre parcel, which includes a ridgetop residence at 3666 Campanil Drive, Santa Barbara. The property is hilly terrain and slopes down to PLP's property.

In 1999, PLP entered into a purchase and sale agreement and joint escrow instructions (purchase agreement) to buy 4.5 acres of Bollag's property for $475,000. After escrow opened on July 23, 1999, PLP paid a $150,000 nonrefundable deposit. The purchase agreement provides that escrow will close upon approval of a lot line adjustment and no later "than two years after the Opening of Escrow, unless extended by mutual consent of Buyer and Seller." (Purchase agreement, § 3.3, p. 4.)

The lot line adjustment was delayed because PLP's property (the 10-acre parcel) and the 4.5 acres are in an unincorporated area, surrounded by property within the city limits. The City of Santa Barbara's (City) general plan states that the Las Positas Valley property should be annexed into the City "at the earliest opportunity."

PLP was advised that the county would not process the lot line adjustment application and that PLP had to annex the property before City approved the lot line adjustment. City required that the project be redesigned as a planned residential development which significantly increased the time and resources for a lot line adjustment. Although PLP sought quick approval due to rising construction costs, it did not obtain City approval before the escrow closing date.

In 2001, Bollag and PLP executed a first amendment to the purchase agreement, extending the escrow five years. The amendment provides for future escrow extensions "by mutual consent of Buyer and Seller, which mutual consent shall not be unreasonably withheld or delayed." Bollag required that PLP pay $315,000, to be credited towards the purchase price, as an "incentive" to complete the transaction.

City required more project changes. PLP had to prepare a comprehensive plan that included landscaping, open space areas, traffic mitigation, restoration of a creek, and landslide mitigation. After PLP spent almost $5 million in project costs, the City Council voted against the project on March 8, 2006. Mark Lee, PLP's managing partner, met with City officials and agreed to make more project changes for the lot line adjustment. PLP, however, needed more time to submit the changes to City and requested a two-year escrow extension. Bollag denied the request.

PLP sued for specific performance and declaratory relief on August 7, 2006. On December 13, 2006, five months after Bollag denied the escrow extension, City approved the annexation, the project, and the lot line adjustment.

At trial, Bollag claimed that PLP was not diligent in obtaining the lot line adjustment, that it was uncertain that the project would ever be approved, and that he was concerned about liability should a landslide occur.

The trial court found that Bollag acted unreasonably in not consenting to the escrow extension and had breached the purchase agreement. Judgment was entered extending the escrow to July 23, 2008, or 60 days after the judgment became final. The trial court awarded PLP $511,282.50 attorney's fees and $19,003.76 costs.

On review, we presume the judgment valid and we resolve all conflicts in the evidence in favor of the prevailing party. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171].) " '[T]he power of the appellant court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted,

which will support the conclusion reached by the [trier of fact]. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (*Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384].)

*Objective Reasonableness*

The analysis of a case depends upon the standard of review. It is not surprising therefore that litigants on appeal often argue differing views on the appropriate standard of review.

Bollag argues that the trial court applied the wrong legal standard in finding that he acted unreasonably in not extending the escrow. Bollag relies on section 15.2 of the Restatement Second of Property which prohibits restraints on the assignment of leases. It provides: "A *reason* for *refusing consent*, in order for it to be *reasonable*, must be objectively sensible and of some significance and not be based on mere caprice or whim or personal prejudice." (Rest.2d Property, Landlord and Tenants, § 15.2, com. g, p. 105, italics added.)

In *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837], our Supreme Court applied section 15.2 of the Restatement Second of Property to a commercial lease that provided that the lease could not be assigned without the lessor's written consent. The court held that the lessor could not arbitrarily or unreasonably withhold his consent to a proposed assignment. (40 Cal.3d at pp. 500–501.)

In 1989, the Legislature enacted Civil Code section 1995.260 to codify the holding in *Kendall* to apply to commercial real property leases. (See Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2008) ¶ 2:301, p. 2B-82.3 (rev. # 1, 2006).) No court, however, has held that section 15.2 of the Restatement Second of Property applies to escrow extensions for the sale of real estate. Unlike *Kendall*, PLP's request for an escrow extension was not an assignment nor did it involve the substitution of new buyers.

Bollag argues that his reasons for not extending the escrow, even if wrong, were reasonable. The trial court, however, discredited Bollag's testimony and concluded he had acted in bad faith. The trial court correctly found that the purchase agreement must be interpreted to carry out the mutual intentions of the parties (Civ. Code, § 1636) and that Bollag was bound by an implied covenant of good faith and fair dealing not to do anything that would destroy or injure PLP's rights under the purchase agreement. (*Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 363 [66 Cal.Rptr.2d 921].)

■ " ' "[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." ' " (*Locke v. Warner Bros., Inc., supra,* 57 Cal.App.4th at p. 363.) This principle is discussed in *Kendall,* which holds that good faith and reasonableness are questions of fact. (*Kendall v. Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 501.) "Denying consent solely on the basis of personal taste, convenience or sensibility is not commercially reasonable." (*Ibid.*)

Bollag argues that he was under no duty to investigate the facts and that his actions were reasonable based on the information that he had. We reject the argument because it transforms objective reasonableness into a subjective standard " 'of fancy, taste or judgment' " in which Bollag " 'is the sole judge of his satisfaction. If he asserts *in good faith* that he is not satisfied, there can be no inquiry into the reasonableness of his attitude.' " (*Locke v. Warner Bros., Inc., supra,* 57 Cal.App.4th at p. 363.)

Good faith and objective reasonableness are questions of fact, based on all the circumstances. (See, e.g., *Glifford v. J & A Holdings* (1997) 54 Cal.App.4th 996, 1006 [63 Cal.Rptr.2d 253].) "The choice of objective or subjective test to evaluate a promisor's satisfaction depends upon the intent of the parties, as expressed in the language of the contract. In the absence of a specific expression in the contract or one implied from the subject matter, the preference of the law is for the less arbitrary reasonable person standard. . . . The reasonableness test is especially preferable when factors of commercial value or financial concern are involved, as distinct from matters of personal taste." (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 59–60 [122 Cal.Rptr.2d 267], citations omitted.)

■ Bollag told PLP that he did not care how long the project took but refused to extend the escrow. If Bollag's actions are reasonable, PLP stands to lose the $465,000 already paid (98 percent of the purchase price) and about $5 million in project costs. Bollag, on the other hand, will keep both the $465,000 and the 4.5 acres. Like the trial court, we are mindful of the rule that equity abhors a forfeiture. (Civ. Code, § 3275; see *Holiday Inns of America v. Knight* (1969) 70 Cal.2d 327, 330 & fn. 2 [74 Cal.Rptr. 722, 450 P.2d 42].)

*Landslide Liability*

Bollag argues that he had good cause not to extend the escrow because of landslide liability concerns. If PLP builds homes that are later damaged by a landslide, it will expose Bollag to liability. Bollag was aware of landslide problems, however, and observed soil failures on his property before the purchase agreement.

In 2000, Bollag hired David Rogers, Ph.D., a geologist and geotechnical engineer, to conduct a geological study. Rogers prepared an April 17, 2000 report documenting numerous landslides and discussed the report with Bollag before the first escrow extension. The report included a geological map depicting 67 landslide areas, some of which were above the PLP project.

The trial court found that "as early as 1998, [Bollag] had geology and land use consultants working on the potential subdivision of his property, some of whom alerted him to the existence of landslides on his property before he entered into the Agreement with Las Positas. Moreover, [Bollag] had graphic knowledge, in the form of [Rogers'] Preliminary Geologic Map, that there were more than 60 landslides on his property at least as early as April 2000, almost a year before he entered into the First Amendment extending the escrow closing date for five years." The trial court concluded that Bollag's knowledge and "subsequent actions are inconsistent with his stated concern about landslide liability, and, consequently, this alleged concern cannot serve as a good faith or reasonable basis for his refusal to extend the escrow . . . ."

Bollag claimed that he became concerned about landslides after the 2005 La Conchita landslide killed several people in Ventura County. Bollag, however, knew nothing about La Conchita other than what he saw in the news and admitted that the soil conditions on his property were not the same as La Conchita. Rogers, who was hired as an expert in the La Conchita landslide case, testified that the geological conditions were very different because La Conchita had a steeper slope and a thrust fault that trapped groundwater. He opined that there was no close comparison between La Conchita and Bollag's property.

Bollag also knew that City would not approve the lot line adjustment unless PLP stabilized the slopes and mitigated the landslide risks. In the first escrow extension, Bollag granted PLP an easement "to complete any and all grading and/or drainage related activities necessary for the stabilization of slopes and the construction of a drainage system or other improvements for the benefits of Buyer's Adjoining Property . . . ." The purchase agreement also provided for easements "measured from the newly formed property line, for grading and drainage activities related to Buyer's subdivision project."

The landslide mitigation measures were substantial and included buttress keyways, reinforced concrete caissons, subdrains, and debris retention basins. Rogers testified that the mitigation measures were safe, effective, and the most conservative he had seen for a hillside development in coastal California. The landslide mitigation measures were also reviewed by URS Corporation, an independent geotechnical engineering firm selected by City.

Bollag's expert, Gary Stoney, testified that City would not have approved the project if there was a significant landslide hazard. Stoney agreed that buttress keyways and reinforced concrete caissons are accepted methods to protect against landslides.

Substantial evidence supports the finding that Bollag's concerns about landslide risks were unreasonable and asserted in bad faith. The trial court did not err in ordering an escrow extension so that PLP could obtain approval of the lot line adjustment and proceed with the project.

### Landslide Liability Insurance

Bollag contends that landslide liability is a legitimate concern because his net worth substantially increased between 2001 and 2006. The trial court discredited the argument because Bollag was already wealthy when the first escrow extension was approved.

Bollag claimed that landslide liability insurance was difficult to purchase but admitted that he made no inquiries about insurance costs or availability. The trial court found no credible evidence that Bollag was less concerned about liability in 2001, when he approved the first escrow extension, than he was in 2006.

As a reviewing court, we do not reweigh evidence or reassess the credibility of witnesses. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622 [34 Cal.Rptr.2d 26].) The testimony of a witness "in derogation of the judgment may not be credited on appeal simply because it contradicts the plaintiff's evidence, regardless how 'overwhelming' it is claimed to be." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].)

### Diligence

Bollag argues that he had good cause not to consent to an escrow extension because PLP delayed the lot line adjustment. The trial court found that PLP diligently sought approval of the application for a lot line adjustment. When PLP applied for the lot line adjustment, it was informed that the property had to be annexed into the City. City changed the project requirements, requiring PLP to spend almost $5 million in project costs. The trial court found that PLP "diligently worked to react and meet City direction and project require-ments throughout dozens of public hearings and staff meetings about what would be necessary to secure the final approvals. The evidence showed that [PLP] met and responded diligently to these challenges and was actively

engaged in preparing or revising designs, interacting with City staff and officials, and participating in hearings."

When PLP asked for more time to obtain the lot line adjustment, Bollag had already made up his mind not to extend the escrow. Mark Lee, PLP's general manager, was surprised because Bollag previously said that he did not care how long the project took, so long as he received the purchase money.

The evidence shows that PLP was diligent and went to great lengths to obtain City approval of the lot line adjustment. Although Bollag claims that PLP wanted to extend the escrow indefinitely, it is uncontroverted that the proposed amendment was for a two-year escrow extension.

### Cloud on Title

Bollag asserts that he had good cause to withhold consent to an escrow extension because an open escrow would result in a continuing cloud on his title. Bollag, however, was able to obtain two $5 million loans and a $5.5 million revolving line of credit on his property. The evidence supported the finding that a second escrow extension would not prejudice Bollag, cloud title, or impair Bollag's ability to obtain financing before the lot line adjustment was approved.

### Security and Privacy

Bollag claims that he had good cause not to extend the escrow because the project drew trespassers and intruders. But such incidents were infrequent. Bollag did not call law enforcement or raise security or privacy concerns at the hearings on the project. Bollag had a gated fence between the project and his house but allowed the fence to fall into disrepair. This supports the inference that trespassers were not a concern.

The trial court found that Bollag "has very significant resources, [but] he has not been willing or felt it necessary to hire a security guard to protect his home. There was no persuasive evidence that Las Positas' development would increase intruders onto Mr. Bollag's property. . . ." The trial court further found that the project would block access to the valley and likely decrease trespassing. It did not err in concluding that Bollag's security and privacy concerns were unreasonable and invoked in bad faith.

### Breach of Purchase Agreement

Bollag argues that PLP breached the purchase agreement in several respects but did not raise these issues until after the action was filed. Before

trial, in a letter dated July 13, 2006, Bollag stated there were two reasons why he would not consent to the escrow extension. The first was that geological reports confirm the property is subject to landslides "which could expose [Bollag] to liability" and that "California has experienced serious landslides (specifically La[] Conchita[]). [Bollag] does not wish to increase his potential liability by having people living and traveling in an area that has experienced slides . . . ." The second stated reason was that PLP "*has taken no steps* to secure an adjustment of the lot line during the last seven years . . . ." (Italics added.)

### Fenced Gate Across the Project

Section 2.6 of the purchase agreement provides: "Buyer shall provide and install a fence and gate at Seller's property line along the property line except where public access is otherwise inhibited due to terrain." Bollag contends that PLP breached the purchase agreement by not building a fence between the 4.5 acres it was purchasing and PLP's 10-acre parcel.

The trial court found that PLP was purchasing the 4.5 acres to increase the size of the housing project. Construction of a fence through the middle of the project would frustrate the stated purpose of adjusting the lot line to make the 4.5 acres part of the project. During the seven years that the escrow was open, no one expected PLP to build a fence across the 4.5 acres. The trial court did not err in finding that Bollag's concerns about a fenced gate were unreasonable and contrary to the terms of the purchase agreement.

### Eucalyptus Trees

Bollag argues that he refused to grant an escrow extension because PLP intends to cut down some trees. Section 2.7 of the purchase agreement provides that "Buyer shall not construct any dwelling nearer than fifty feet from the trunk of any eucalyptus trees on Seller's property."

The setback requirement protects against fire hazards so homes are not built close to the trees on Bollag's property. A grove of eucalyptus trees is on the 4.5 acres and extends onto Bollag's property. Bollag asserts that section 2.7 of the purchase agreement prohibits PLP from cutting down any tree.

The trial court found: "There is no language in the Agreement . . . requiring Las Positas to leave all the eucalyptus trees in place; on the contrary, the parties were aware that the entire reason for Las Positas' purchase was to have more land to develop, not to leave land purchased for development encumbered with a grove of trees and thus undevelopable. Moreover, Las Positas proffered evidence that the trees on the Bollag

Property (i.e., the 'Seller's property' in the words of the Agreement) will in fact remain with the agreed setback from any homes developed by Las Positas. No credible evidence was presented that Las Positas has or will breach this provision of the Agreement."

The trial court did not err in finding that Bollag's construction of the purchase agreement was unreasonable. (Civ. Code, §§ 1643, 3542.) The evidence shows that Bollag was trying to impose new contract conditions to avoid extending the escrow.

### Advising Bollag of Project Status

Bollag claims that PLP breached section 8.4 of the purchase agreement by not keeping him informed of the status of the project. Section 8.4 provides: "Application Agent. Seller appoints Mark B. Lee [general manager of PLP] as Seller's agent for the purpose of pursuing the lot line adjustment and development applications described above, provided that Buyer keeps Seller reasonably informed as to the status of all such applications and provided that Buyer indemnifies Seller against any and all claims, costs and expenses against Seller arising from or related to such agency."

PLP's general manager, Mark Lee, discussed the project with Bollag and forwarded copies of project documents that were submitted to City. Lee also put Bollag on the City mailing list so that Bollag received copies of staff reports and notices of project hearings. When Lee spoke to Bollag about the project, Bollag said that he was busy and did not want to hear about project details.

The trial court found that Bollag "was well informed of the progress of the Las Positas land use application and that he never complained to Las Positas about not receiving desired information. The language of section 8.4 provides that the requirement to keep [Bollag] reasonably informed is only a condition for the granting of the land use agency. The consideration for Mr. Bollag's sale of the 4.5 acres was the purchase price, and therefore the breach of this obligation, even if [it] had occurred, would not excuse Mr. Bollag's performance . . . , nor would it constitute reasonable or good faith grounds for him to refuse the requested extension."

We agree. Bollag told PLP that he did not care how long the project took and that his only concern was payment of the purchase price. This was corroborated by Bollag's demand for a $150,000 nonrefundable purchase deposit and the $315,000 payment for the first escrow extension. After the escrow expired, Bollag continued to accept interest payments, which is inconsistent with the defense theory that the purchase agreement terminated

in 2006. Bollag also claims that PLP breached section 8.2(i) of the purchase agreement by not defending and indemnifying him in a California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) action after City approved the project. PLP, however, retained a law firm to represent PLP and Bollag in that action. The trial court found that "[n]o credible evidence was presented . . . that [PLP] has refused or denied an obligation to indemnify [Bollag]."

### Statement of Decision

■ Bollag complains that the statement of decision does not discuss all the evidentiary and legal issues raised in his written objections. A trial court is required only to state ultimate facts and the legal grounds upon which the judgment rests. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230 [8 Cal.Rptr.2d 293].) "A statement of decision need not address all the legal and factual issues raised by the parties." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124–1125 [94 Cal.Rptr.2d 579].)

The 10-page statement of decision explains in detail why Bollag acted unreasonably in not consenting to the escrow extension. On review, we may not reweigh the evidence, decide disputed questions of fact, or remand with directions for the trial court to respond point by point to the issues posed by Bollag on appeal. (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [25 Cal.Rptr.2d 242].)

### Specific Performance

The trial court ordered that the escrow be extended to July 23, 2008, or until 60 days after the judgment becomes final, whichever is later. Bollag complains that the order is improper because PLP did not ask for an extension to July 23, 2008, nor did Bollag refuse to extend the escrow to that date.

The record is to the contrary. A letter from the escrow company was received into evidence stating that escrow opened on July 23, 1999. The original escrow was for two years and extended five years in 2001.

In a July 13, 2006 letter, PLP requested a two-year extension and enclosed an amendment to the purchase agreement which Bollag rejected.

PLP's complaint prayed for "an order requiring [Bollag] to execute a Second Amendment to the Agreement and escrow instructions extending the close of escrow by two years" and such further relief as the trial court may deem proper.

■ The trial court did not err in ordering an escrow extension to July 23, 2008. As a court of equity, it has the inherent power to make its judgment effective by supervising the details of the specific performance decree. (See, e.g., *Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 768–769 [195 Cal.Rptr. 417] [trial court extended deadline for buyer to deposit purchase money under decree for specific performance].)

## *Attorney's Fees*

Bollag finally argues that the award for $511,282.50 in attorney's fees is excessive because it exceeds the purchase price. The purchase agreement provides that the prevailing party shall recover actual attorney's fees.[1] (Civ. Code, § 1717.)

Bollag argues that the fee award is excessive because it was a simple case, because PLP employed two experienced attorneys to try the case when one would do, because PLP engaged in unnecessary discovery and hired a land use expert who did not testify, and because PLP's trial attorneys do not work in the same law firm as PLP's s land use attorney.

These arguments were rejected by the trial court in a four-page order. The trial court found that Bollag interjected collateral issues to complicate the litigation, that Bollag's "vigorous defense necessitated a great deal of work by experienced attorneys," and there was no duplication of litigation efforts. The trial court reduced the attorney's fees by $2,171 and the paralegal fees by 25 percent, and found that the remaining fees ($511,282.50) were reasonable and necessary to prosecute the action. The order awarding fees states that Bollag "makes much of the fact that the fees requested exceed the amount plaintiff agreed to pay for the property. But this is not a case of a fungible piece of property. Not only was plaintiff protecting the $465,000 investment it had already paid to defendant, but it was protecting the viability of its entire project and future profits anticipated therefrom. The land is contiguous to plaintiff's land . . . and is necessary to the development plaintiff is pursuing. The value of the land to plaintiff is not simply the purchase price and defendant has always been aware of that fact."

---

[1] Section 15.10 of the purchase agreement states: "Attorneys' Fees. If any legal action, arbitration or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach, default or misrepresentation in connection with this Agreement, the successful or prevailing party shall be entitled to recover actual attorneys' fees (including fees for paraprofessionals and similar personnel and disbursements) and other costs it incurred in that action or proceeding, in addition to any other relief to which it may be entitled. The parties agree that actual attorneys' fees shall be based on the attorneys' fees actually incurred (based on the attorneys' customary hourly billing rates) rather than the court or arbitrator making an independent inquiry concerning reasonableness."

■ The amount of attorney's fees is within the sound discretion of the trial court. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095–1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) Here the fees are well documented and reasonable in light of the complexity of the issues, Bollag's aggressive litigation posture, and the results obtained. ■ "A defendant ' "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." ' " (*International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 304 [81 Cal.Rptr.2d 456].) Bollag makes no showing that the fee award is excessive or exceeds the bounds of reason. (*Mustachio v. Great Western Bank* (1996) 48 Cal.App.4th 1145, 1151 [56 Cal.Rptr.2d 33].)

The judgment is affirmed. Respondent PLP is awarded costs and attorney's fees on appeal in an amount to be determined by the trial court on noticed motion.

Yegan, J., and Perren, J., concurred.

A petition for a rehearing was denied April 8, 2009, and on March 26, 2009, the opinion was modified to read as printed above.