Filed 12/4/13

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| AVIDITY PARTNERS, LLC, as Trustee, etc., | C070255 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2009-00042016-CU-BC-GDS) |
| v. | |
| STATE OF CALIFORNIA, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Raymond Cadei, Judge. Affirmed.

Pillsbury Winthrop Shaw Pittman, Robert L. Wallan, John M. Grenfell and Kimberly L. Buffington for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Senior Assistant Attorney General, Robert W. Byrne, Denise Ferkich Hoffman, Supervising Deputy Attorneys General, Daniel S. Harris and Jan Zabriskie, Deputy Attorneys General for Defendant and Respondent.


This case involves the historic Headwaters Agreement (Agreement) between Pacific Lumber Company (Pacific Lumber), the federal government, and the State of California (defendant or State) pursuant to which Pacific Lumber transferred 7,000 acres of old growth redwood forestland to State in exchange for other forestland and $495.5

1

million dollars. The Agreement was negotiated over the course of three years and included specified regulatory approvals required for Pacific Lumber's harvest of its forestland. The complaint was originally filed by Pacific Lumber and Scotia Pacific Company, LLC, a wholly owned subsidiary of Pacific Lumber. Plaintiff Avidity Partners, LLC, (Avidity) is the litigation trustee for the bankruptcy estate of Scotia Pacific Company, LLC.

Avidity's complaint for damages for breach of contract is based upon the claim that defendant State promised Pacific Lumber it would be able to harvest the trees on its remaining 211,000 acres of timberland at an average level of 176.2 million board feet per year during the first decade of the Agreement. The breach of the covenant of good faith and fair dealing claim is based upon Avidity's argument that in order for Pacific Lumber to harvest at that rate, defendant had to consider and approve Pacific Lumber's timber harvest plans in a timely manner, and that the delay in processing the timber harvest plans denied Pacific Lumber the contemplated benefits of the Agreement. Avidity's promissory estoppel claim is an alternative claim, by which Avidity argues State's promises can be enforced even if we determine the promises were not supported by consideration.

Avidity's arguments are based on the premise that the State has exercised its legislative and environmental powers to circumvent the promises made to it by the State in the Agreement, thereby breaching the Agreement and entitling it to damages. (*United States v. Winstar Corp.* (1996) 518 U.S. 839 [135 L.Ed.2d 964] (*Winstar*).) We find it unnecessary to reach these arguments because the State's contracts with Pacific Lumber do not contain a promise that Pacific Lumber could harvest at the rate of 176.2 million board feet per year for the first ten years.

The trial court granted State's motion for summary judgment. Avidity appeals from the ensuing judgment.

We shall affirm the judgment. The express terms of the Agreement do not promise Pacific Lumber a particular harvest level. The covenant of good faith and fair dealing does not operate to supply a term that the express contract does not otherwise contain. The term Avidity seeks to imply, a guaranteed harvest level, was specifically rejected in negotiations.[1] Moreover, such term is not necessary to prevent the Agreement from being illusory or unenforceable. Finally, the claim of promissory estoppel fails because Pacific Lumber's alleged reliance was the bargained-for consideration it promised as its part of the Agreement, making this case unsuited to a claim of promissory estoppel.

---

[1] At oral argument, Avidity denied it is claiming that the Agreement guaranteed Pacific Lumber a certain harvest level. Avidity alleged the State prevented Pacific Lumber from "realizing the regulatory certainty and harvest volumes assured to it under the Headwaters Agreement . . . ." We fail to see how the claim may be construed as one other than a guarantee that the State would not prevent Avidity from reaching that level. Avidity stated at oral argument that far from allowing it to harvest at the contracted level, the State did not allow it to harvest *at all*. This was not a claim made in the complaint to which the summary judgment was addressed. Rather, the complaint alleged that the State breached the contract by "prohibiting Pacific Lumber from harvesting at the economically viable level set forth in the [Sustained Yield Plan];" by "seeking to impose a lesser rate of harvest on Pacific Lumber's property and to foreclose harvesting altogether in certain additional areas;" and by "precluding Pacific Lumber from obtaining timely approved [Timber Harvest Plans] in compliance with the [Sustained Yield Plan] . . . ."

FACTUAL AND PROCEDURAL BACKGROUND[2]

We begin with a few background facts as related in the Supreme Court opinion *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459 (*EPIC*), an earlier case arising out of the Agreement. Pacific Lumber owned "approximately 211,000 acres of timberland in Humboldt County that have been used for commercial timber production for some 120 years. In 1986 Pacific Lumber was acquired by Maxxam Incorporated, and in order to pay off Maxxam's debt for the buyout, Pacific Lumber began cutting down old growth redwoods at a faster rate than ever before. The deforestation led to litigation and considerable local protest. [¶] In the 1990's, as a result of federal and state litigation, Pacific Lumber was enjoined from harvesting a particular stand of old growth timber that served as the habitat for the marbled murrelet, an endangered bird. Pacific Lumber, in turn, filed lawsuits alleging an unlawful taking by the state and federal governments of the land declared unusable for timber production and harvesting. [¶] To resolve the existing controversies,

---

[2] For convenience we list the acronyms in the opinion.

    ACP  Aquatics Conservation Plan

    CDF  California's Department of Forestry and Fire Protection

    HCP  Habitat Conservation Plan

    ITP  Incidental Take Permit

    SYP  Sustained Yield Plan

    THP  Timber Harvest Plan

    TMDL's  Total Maximum Daily Loads

    WDR's Waste Discharge Requirements

    WWDR's Watershed-wide WDR's

Pacific Lumber entered into the Headwaters Agreement of 1996 with the State of California and the United States.  The Agreement provided for the sale of some 7,000 acres of Pacific Lumber's timberland to the federal government and the State of California, and for Pacific Lumber to obtain . . . various regulatory approvals . . . for its remaining 211,000 acres."  (*EPIC*, *supra*, 44 Cal.4th at pp. 472-473.)

The Agreement contemplated the approval of a Habitat Conservation Plan (HCP), an Incidental Take Permit (ITP), and a Sustained Yield Plan (SYP).  The approvals expressly contemplated by the Agreement did not include a Timber Harvest Plan (THP).  As explained in *EPIC*, "A[n SYP] is a kind of master plan for logging a large area, authorized by statute (Pub. Resources Code, § 4551.3) and regulation (Cal. Code Regs., tit. 14, §§ 1091.1–1091.14), designed to achieve the Forest Practice Act's objective of obtaining the maximum timber harvest consistent with various short- and long-term environmental and economic objectives.  (Z'berg–Nejedly Forest Practice Act of 1973; Pub. Resources Code, § 4511 et seq.) . . . [T]he SYP does not replace the more specific timber harvest plan (THP), but inasmuch as the SYP adequately analyzes pertinent issues, a THP may rely on that analysis.  Although SYP's are usually voluntary at the option of the landowner, in this case the SYP was required by the Headwaters Agreement.[3]"  (*EPIC, supra*, 44 Cal.4th at p. 471, fn omitted.)

---

[3] The SYP was declared invalid in 2008 by the Supreme Court in *EPIC, supra,* 44 Cal.4th at p. 526, because there was no identifiable final SYP, and because it did not include the required individual watershed planning analyses.  (*Id*. at pp. 491-497, 500-504.)  *EPIC* also held that the ITP's no-surprises clauses were inconsistent with Pacific Lumber's statutory duty to fully mitigate the impacts of its incidental take as set forth in Fish and Game Code section 2081, subdivision (b)(2).  (*Id.* at pp. 506-514.)  State argues Pacific Lumber failed to perform a material condition of the SYP approval when it did not prepare a single document based on a harvest yield of 176.2 million board feet per year.  It argues that because *EPIC*, *supra*, declared the SYP invalid on this basis, the SYP was invalid *ab initio*.  For the purposes of this opinion, we will assume the validity of the SYP.

"Also required . . . under federal law was a[n HCP]. Although the 'taking' of a federally listed endangered species, i.e., the killing, capturing or harming of such species (16 U.S.C. § 1532(19)), is generally unlawful (*id.,* § 1538), a permit for the taking of a species incidental to an otherwise lawful activity, known as an [ITP], may be issued when an applicant submits to the Secretary of the Interior a[n HCP].  (16 U.S.C. § 1539(a)(2)(A).)  The plan is to specify, among other things, the impacts that will likely result from the taking and the steps the applicant intends to employ to minimize and mitigate those impacts.  (*Ibid.*)  . . . In addition to a federal [ITP], Pacific Lumber in this case was required to obtain a state [ITP] for species listed as endangered or threatened under the California Endangered Species Act (Fish & G. Code, § 2050 et seq.).  [¶]  In conjunction with approval of the HCP, the United States Fish and Wildlife Service, Pacific Lumber, and various state agencies entered into an Implementation Agreement for the HCP, defining the obligations of each party under the HCP."  (*EPIC*, *supra*, 44 Cal.4th at pp. 471-472.)  The deadline for obtaining the regulatory approvals necessary to close the Agreement was March 1, 1999.  (*EPIC, supra,* at p. 470.)

The 1996 Agreement was entered into by Maxxam, Inc., Pacific Lumber, the United States, and the State, and was signed on behalf of the State by Douglas Wheeler, who was then the Secretary of Resources.  The Implementation Agreement was entered into by various agencies of the federal government, California's Department of Fish and Game,[4] California's Department of Forestry and Fire Protection (CDF),[5] and Pacific

---

[4] Effective January 1, 2013, California's Department of Fish and Game was renamed the Department of Fish and Wildlife.  (Fish & G. Code, §37; Stats. 2012, ch. 559. § 5.)

[5] California's Department of Forestry and Fire Protection's acronym was recently changed from CDF to CAL FIRE.  We use CDF here, because that is the acronym the agency was known by during the administrative review process and throughout this litigation.

Lumber. A letter of approval (the Approval Letter) was sent to Pacific Lumber's president and CEO by Richard Wilson, the Director of CDF on March 1, 1999.

Escrow instructions for the Agreement were executed on February 28, 1999. The instructions required that the parties deposit into escrow, inter alia, the Implementation Agreement, the Agreement, the SYP, and the HCP. These documents, together with the Approval Letter are the documents on which Pacific Lumber relies in this action.

General Allegations

Avidity's second amended complaint alleged the following. The federal and state agencies provided written assurances that the implementation of the HCP and SYP would allow harvest levels that were acceptable to Pacific Lumber, and that the harvest level in the SYP was "approved at 176.2 mmbf [(million board feet)]" per year. Avidity also alleged that since 1987, the state and regional water boards have waived waste discharge requirements (WDR's) for timber harvesting, and have taken the position that timber harvesting operations were not subject to WDR's because the Forest Practice Rules constituted best management practices. Avidity claims this position was relied upon by the parties in negotiating and carrying out the Headwaters Agreement.

A few months after the Agreement closed, the Legislature passed Senate Bill No. 390 (1999-2000 Reg. Sess.), requiring that all waivers of WDR's that were in place in 1999 to sunset on January 1, 2003, and limiting the duration of any new waivers to five years or less. (Wat. Code, § 13269.) The North Coast Regional Water Quality Control Board (Regional Water Board) thereafter ordered Pacific Lumber to submit applications for WDR's for timber harvesting, and drafted and adopted eligibility requirements for categorical waivers of WDR's that effectively excluded Pacific Lumber from the waiver, even for its THP's that had already been approved.[6]

_____

[6] The Forest Practice Act (Z'berg–Nejedly Forest Practice Act of 1973; Pub. Resources Code, § 4511 et seq.) requires " 'that logging be carried out only in conformance with a

7

The Implementation Agreement contained an adaptive management provision, the purpose of which was "to provide a mechanism to ensure that HCP prescriptions are implemented in a manner that reflects sound science, taking into account new data and analysis. Adaptive management also provides flexibility by allowing alternative approaches for achieving biological goals under certain circumstances, in order that the HCP can be implemented in a manner that is sensitive to both economic concerns and biological necessities." The Implementation Agreement's adaptive management section provided: "[Pacific Lumber] may at any time propose changes to elements of the Aquatics Conservation Plan [(ACP)] that are not in conflict with [Assembly Bill No.] 1986[7] as part of adaptive management. At [Pacific Lumber]'s request, any such changes proposed . . . shall be promptly reviewed by the peer review panel established pursuant to Section 3.1.3.1(k) of this Agreement.[8] . . . The Wildlife Agencies will consider [Pacific Lumber]'s proposed changes, the peer review panel's written evaluation, if any, and other available information. The Wildlife Agencies shall approve [Pacific Lumber]'s proposed changes that are not in conflict with [Assembly Bill] 1986 unless they find, in writing, that [Pacific Lumber]'s proposed changes will impair the ability of the plan to maintain or achieve, over time, properly functioning aquatic habitat conditions."

---

timber harvesting plan (THP or plan) submitted by the timber owner or operator and approved by the [D]epartment [of Forestry and Fire Protection] after determining, with an opportunity for input from state and county agencies and the general public, that the proposed operations conform to the [Forest Practice] Act and rules and regulations. ([Pub. Resources Code,] §§ 4581-4582.75, 4583; [citations].)' " (*EPIC, supra*, 44 Cal.4th at p. 481.)

[7] Assembly Bill No. 1986 (1997-1998 Reg. Sess.; hereafter Assembly Bill 1986) is the legislation that authorized the State to enter into the Agreement. (Stats. 1998, ch. 615.)

[8] This is apparently a reference to section 3.1.3.1. (xi) of the Implementation Agreement.

8

The complaint alleged that all of the agencies taking part in the watershed analysis for the Freshwater Creek watershed *except* the Regional Water Board agreed to modify certain prescriptions that had previously limited the areas that could be harvested, finding harvest activities to be insignificant contributors of sediment in the watershed. The complaint asserted that the Regional Water Board recommended to the peer review panel that the prescriptions on harvesting be heightened, rather than relaxed, but that the peer review panel did not adopt the Regional Water Board's recommendations. The Regional Water Board did not accept the resolution of the peer review panel and continued to unilaterally seek to impose the conditions it had proposed to the peer review panel.

In 2003 the Legislature passed Senate Bill No. 810 (2003-2004 Reg. Sess.; hereafter Senate Bill 810) (Pub. Res. Code § 4514.3), which gave the Regional Water Board an additional mechanism to influence timber harvesting plans. Prior to the passage of Senate Bill 810, timber operations were exempt from specified waste discharge requirements if the federal Environmental Protection Agency certified that provisions of the Forest Practice Act constituted the best management practices for silviculture pursuant to the Federal Water Pollution Control Act. (Stats. 2003, ch. 900, § 1, p. 6592.) Senate Bill 810 provided that both the State Water Resources Control Board and the federal Environmental Protection Agency must certify that provisions of the Forest Practice Act constitute best management practices for silviculture. (Pub. Resources Code, § 4515.3, subd. (a).)

The complaint alleged that in December 2003, the Regional Water Board called for the development of watershed-wide WDR's (WWDR's) for Pacific Lumber's scheduled operations in the Elk River and Freshwater Creek watersheds, even though other timber companies were given a categorical waiver of WDR's for their THP's. While the WWDR's were being prepared, Pacific Lumber sought coverage for some of its approved THP's under the general WDR's. The complaint alleged that the Regional Water Board agreed to grant coverage to only a reduced number of Pacific Lumber's

THP's, thereby preventing Pacific Lumber from proceeding with scheduled operations under THP's already approved by the CDF as consistent with the HCP and SYP.

The complaint alleged that in December 2005, the Regional Water Board informed Pacific Lumber that no further THP's would be approved under the general WDR's until the WWDR process was complete and told Pacific Lumber to refrain from filing any THP's. It also alleged that the Regional Water Board stated it would veto any THP's filed by Pacific Lumber.

Key to the dispute is the State's failure to approve Pacific Lumber's THP's. Logging may be " 'carried out only in conformance with a [THP] submitted by the timber owner or operator and approved by [CDF] after determining, with an opportunity for input from state and county agencies and the general public, that the proposed operations conform to the [Forest Practice] Act and rules and regulations. . . . Since 1976, the THP preparation and approval process developed under the [Forest Practice] Act has been certified as the functional equivalent to, and hence an adequate substitute for, the full environmental impact report (EIR) process required by CEQA. [Citations.]' [Citation.]" (*EPIC, supra*, 44 Cal.4th at p. 481.)

Defendant moved for summary judgment as to the breach of contract cause of action on the grounds: (1) the Agreement did not promise economic viability or regulatory certainty, (2) the HCP and SYP[9] did not assure economic viability, (3) defendant's only duty to defend the Agreement was against third parties, (4) the enactment and enforcement of water quality laws is an exercise of the State's police power, and (5) the California Resources Agency director who signed the Agreement did not have the authority to exempt Pacific Lumber from legislative actions or from actions of the state or regional water boards.

---

[9] Note that the SYP was ruled invalid in *EPIC*. (See *ante,* fn. 3.)

Defendant moved for summary judgment as to the breach of covenant of good faith and fair dealing cause of action on the grounds: (1) the cause of action was duplicative of the breach of contract claim; (2) there were no substantive duties beyond the specific terms of the Agreement; (3) any alleged promise was not so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (4) a promise pertaining to the exercise of police powers had to be explicit, unambiguous, and in writing; and (5) Pacific Lumber had no reasonable expectation that the defendant would exempt it from environmental regulations and guarantee its economic viability when defendant repeatedly rejected Pacific Lumber's requests to include such provisions.

Defendant moved for summary judgment on the cause of action for promissory estoppel on the grounds: (1) Pacific Lumber did not perform any act that was different from the act it performed as consideration for the contractual promise, (2) there was no clear and unambiguous promise, and (3) applying estoppel would effectively nullify a strong rule of policy adopted for the benefit of the public (protecting water quality).

The trial court appointed a discovery referee in the action and authorized the referee to hear any motions for summary judgment. The referee recommended the denial of the motion for summary judgment. As to the breach of contract cause of action, the referee rejected defendant's position that the only agreement the complaint alleged to have been breached was the actual Agreement executed in 1996. The referee reasoned that Avidity's claim that the Agreement together with the closing documents reflected the final terms of the agreement was adequately pled in the complaint, and since there was substantially one transaction, the documents were to be taken together. Citing various provisions in the Implementation Agreement and a letter to Pacific Lumber from the federal government with which the CDF and Department of Fish and Game concurred in part, the referee determined the defendant failed to show that the breach of contract claim could not be established. The referee also rejected defendant's summary judgment

11

motion as to the breach of the implied covenant of good faith and fair dealing and promissory estoppel causes of action.

Defendant objected to the referee's recommendation and requested that the trial court independently review the motion. The trial court held a hearing on defendant's objection, and initially issued a tentative ruling adopting the recommendation in full to deny defendant's motion. However, after a hearing, the trial court reversed course and declined to adopt the referee's ruling. The court granted the motion for summary judgment on the ground the Implementation Agreement included an express provision waiving the right of either party to recover monetary damages for a breach of the Agreement, a ground not specifically tendered by defendant in its notice of motion. The trial court concurred with the referee's conclusion that the Agreement should be considered to include the closing documents for purposes of the motion.

DISCUSSION

Avidity's arguments are based on the premise that the State has exercised its legislative and environmental powers to circumvent the promises made to it by the State in the Agreement thereby breaching the Agreement. In particular the complaint alleged that all of the agencies taking part in the watershed analysis for the Freshwater Creek watershed *except* the Regional Water Board agreed to modify certain prescriptions that had previously limited the areas that could be harvested, finding harvest activities to be insignificant contributors of sediment in the watershed. As a result the Regional Water Board refused to sign the timber harvesting plans necessary to harvest at the level of 176.2 million board feet per year. It alleges that the federal and state agencies provided written assurances that the implementation of the HCP and the SYP would allow harvest levels that were acceptable to Pacific Lumber, and that the harvest level in the SYP was "approved at 176.2 mmbf [(million board feet)]" per year.

The SYP was declared invalid in 2008 by the Supreme Court in *EPIC, supra*, 44 Cal.4th at p. 526, and statutory authority granted its agencies after the Agreement

12

impeded Avidity from reaching its agreed-upon harvest levels. Avidity's arguments are based upon the view that while an agreement to limit the future exercise of the State's police power may be unenforceable, the government nevertheless is liable in damages for breaching the Agreement. In *Winstar, supra*, 518 U.S. 839, the court held that the contracts at issue were enforceable in damages as long as the enforcement did not bar the exercise of the government's sovereign power. (*Id*. at p. 880.) The State argues that a promise to limit the future exercise of police power cannot be enforced by a suit for damages.[10]

We find it unnecessary to reach these arguments because the State's contracts with Pacific Lumber do not contain a promise that Pacific Lumber could harvest "176.2 mmbf [(million board feet)]" of timber per year. The analysis follows.

I
Standard of Review

We review the trial court's order granting summary judgment de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We review the issues framed by the

---

[10] One of State's arguments is that a promise to limit the future exercise of police power (in this case compliance with water quality laws) cannot be enforced by a suit for damages. Avidity argues that while an agreement to limit the future exercise of police power may be unenforceable, the government is nevertheless liable in damages for breaching the agreement. The case it cites is *Winstar, supra,* 518 U.S. 839. In that case, three savings and loan associations contracted with the federal government to purchase other failing savings and loans, and the government agreed to give the purchasing entities certain favorable accounting treatment. (*Id*. at p. 858.) When federal rules changed, the acquiring entities immediately fell out of compliance with regulatory capital requirements, and two of the entities were seized and liquidated by thrift regulators. (*Id*. at pp. 857-858.) The court held that the contracts were enforceable in damages as long as such enforcement did not bar the exercise of the sovereign power. (*Id*. at p. 880.) State argues that *Winstar* is a product of federal jurisprudence and does not apply to California law, which holds that a contract which has as its object to exempt anyone from responsibility for violation of the law is against public policy. (Civ. Code, § 1668.) I n any event, our conclusion that the contracts do not contain an agreement that Pacific Lumber could harvest at least a certain number of board feet make analysis of this argument unnecessary.

pleadings to determine the scope of the issues tendered and to determine whether the moving party has established facts negating the opponent's claim and justifying a judgment in the moving party's favor. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065.) In so doing we determine whether the opposition to the motion demonstrates the existence of a triable issue of material fact. (*Ibid.*) We review the evidence in the light favorable to the opposition to the motion, and liberally construe the opposition's evidence, while strictly scrutinizing the successful party's evidence and resolving any evidentiary ambiguities in the opposition's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

II
Breach of Contract

A. Damages Waiver

Avidity alleged that the State agreed Pacific Lumber would be able to manage and harvest its timberland in an economically viable manner, and that no additional water quality restrictions above those contained in the HCP would be imposed, except through the adoption of TMDL's (total maximum daily loads)[11] or the approval of THP's under the SYP. Avidity alleged defendant breached this agreement by prohibiting Pacific Lumber from harvesting at the level set forth in the SYP, by seeking to impose a lesser rate of harvest on Pacific Lumber's property, by precluding Pacific Lumber from

---

[11] "A TMDL defines the maximum amount of a pollutant that can be discharged or 'loaded' into the relevant water segment from all sources. A TMDL must be established at a level that will implement the applicable water quality objective." (*San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1115.)

14

obtaining timely approval of THP's, by imposing additional restrictions beyond those contained in the Agreement, by frustrating Pacific Lumber's ability to operate under the THP's approved by CDF, by imposing conditions on Pacific Lumber's operation that denied it the benefits of the HCP's watershed analysis and adaptive management provision, and by failing to enforce the terms of the Agreement.

The trial court granted the defendant's motion for summary judgment on the ground that a clause in the Implementation Agreement, which waives monetary damages, applies to the whole agreement and precludes a claim of contract damages. The trial court reasoned that since the Agreement consists of several documents, one of which is the Implementation Agreement, and that the damages waiver applies to claims regarding any of the documents.

We shall conclude that the damages waiver does not apply to every agreement entered into between Pacific Lumber and the State, contrary to the trial court's finding, but it does apply to its own terms and to the HCP.

The damages waiver is found in the Implementation Agreement. Avidity claims the waiver applies only to breaches of the Implementation Agreement and not to the provisions on which it bases its claim. Several provisions of the Implementation Agreement bear on this question.

The damages waiver provides:

"No Party shall be liable in damages to any other Party or other person for any breach of *this Agreement*, any performance or failure to perform a mandatory or discretionary obligation imposed by this Agreement or any other cause of action arising from this Agreement. Notwithstanding the foregoing sentence:

"(i) Retention of Liability. Each Party shall retain whatever liability it would possess for its present and future acts or failure to act without existence of this Agreement." (Italics added.)

The term "this Agreement" is defined in the Implementation Agreement as the "Agreement Regarding the Implementation of the [Pacific Lumber] Habitat Conservation

15

Plan by and among USFWS [(United States Fish and Wildlife Service)], NMFS [(National Marine Fisheries Service)], CDFG [(California's Department of Fish and Game)], CDF and [Pacific Lumber]." However, the Implementation Agreement also says its purpose is "to ensure implementation of each of the terms of the HCP [(Habitat Conservation Plan)]" and to "describe remedies ... should any party fail to perform its obligations as set forth in the HCP" and the Implementation Agreement. The Implementation Agreement incorporates the conservation and management measures in section six of the HCP, concerning aquatics conservation and watershed analysis, a key portion of the Agreement that Avidity alleges the Regional Water Board, and consequently the State, violated.

" 'A contract may validly include the provisions of a document not physically a part of the basic contract. . . . "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." ' [Citations.] [¶] The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.' (Compare *Baker v. Aubry* [(1989)] 216 Cal.App.3d [1259,] 1264 with *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 644 [223 Cal.Rptr. 838].)" (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54.)

We conclude the HCP was incorporated into the Implementation Agreement. As indicated, part of the HCP was expressly incorporated. Furthermore, the Implementation Agreement was for the purpose of implementing all of the terms of the HCP, and for describing the remedies for failure to perform the HCP. The damages waiver is part of

16

the description of remedies for failure to perform the HCP. Thus, the damages waiver applies to the Implementation Agreement and the HCP.

B. The Headwaters Agreement Contains No Assured Harvest Level

Avidity attempts to construct an agreement guaranteeing a set harvest level out of various documents in the record as well as the SYP. Avidity denies it is claiming the State "guaranteed" Pacific Lumber's harvest level, but it asserts Pacific Lumber had the absolute right, barring circumstances outside the State's control, to cut 176.2 million board feet per year. The SYP is not in the record and was invalidated in EPIC on the ground it could not be determined of what documents it was composed. As noted, we proceed on the assumption that there is a viable SYP.

There is no express provision in any of the tendered documents assuring the State would allow Pacific Lumber to harvest a set amount, nor is there any provision from which such an assurance can be implied. Avidity places substantial reliance on the referee's recommendation to supply evidence of an express or implied term guaranteeing Pacific Lumber a minimum harvest level. As we shall demonstrate, the contract provisions cited in the referee's recommendation were either: (1) taken from the Implementation Agreement, thus subject to the damages waiver; (2) from the Letter Agreement, which exclusively related to clarification of aspects of the HCP and the Implementation Agreement--both subject to the damages waiver; or (3) a quote from the referee's own report, and not evidence of any contract term whatsoever.

Avidity alleged that defendant agreed Pacific Lumber's timber harvesting would be regulated by an HCP and SYP in a form and substance acceptable to Pacific Lumber. It further alleged that this contract term "meant that no additional water quality restrictions above those contained in the HCP would be imposed except through the adoption of TMDLs (or in approving THPs under the SYP)." Avidity argues the state agreed that Pacific Lumber would be able to operate its forestry business "economically" and that the authorized harvest level would be "economically viable."

17

However, Avidity asserts in its reply brief that it never argued that the Agreement guaranteed Pacific Lumber's economic viability or exempted Pacific Lumber from State water quality laws. Instead, it argues that the Agreement assured Pacific Lumber the right to log 176.2 million board feet per year during the first decade of the Agreement. We take Avidity at its word and address only that allegation as the basis of the breach of contract cause of action.[12]

1. The Documents Making up the Headwaters Agreement

We examine the individual documents Avidity Claims constitute the entire agreement between the parties.

a. The 1996 Headwaters Agreement

The 1996 Agreement provided for the development of an HCP, SYP, and ITP. The State agreed to use its best good faith efforts to achieve expedited development and processing of an SYP, and to review and approve the SYP. The 1996 Agreement contains no promises as to harvest level.

b. The SYP

As indicated, the SYP is not a part of the record, so it is impossible to tell whether it contained the contract term Avidity alleges, and moreover it was invalidated in *EPIC, supra*, 44 Cal.4th at p. 526. In any event, Avidity does not point to any particular language in the SYP containing a promise that Pacific Lumber had the right to log 176.2 million board feet per year during the first decade of the Agreement. Indeed, an SYP is not itself an agreement at all. It is a plan that may be submitted by the landowner for the purpose of "addressing long-term issues of sustained timber production, and cumulative

_____

[12] Avidity's waiver and our determination that there was no contract term assuring Pacific Lumber it could reach a definite harvest level makes it unnecessary for us to consider State's argument that CDF and the Department of Fish and Game were not authorized to exempt Pacific Lumber from the state's water quality laws and that the SYP and HCP do not exempt Pacific Lumber from the state's water quality laws.

effects analysis which includes issues of fish and wildlife and watershed impacts on a large landscape basis." (Cal. Code Regs., tit. 14, § 1091.1, subd. (b).) The SYP addresses "issues of sustained timber production, watershed impacts and fish and wildlife . . . ." (Cal. Code Regs., tit. 14, § 1091.2.) The SYP is a demonstration by the landowner as to how it "will achieve maximum sustained production . . . while giving consideration to regional economic vitality and employment at planned harvest levels during the planning horizon." (Cal. Code Regs., tit. 14, § 1091.45, subd. (a).) The role of the CDF director is to review and approve or disapprove the SYP. (Cal. Code Regs., tit. 14, § 1091.10.) In doing so, the director considers whether the SYP satisfies the requirement of maximum sustained production and whether the SYP identifies potentially significant adverse impacts and includes feasible measures necessary to mitigate or avoid such impacts. (Cal. Code Regs., tit. 14, § 1091.10.)

Avidity claims the SYP/HCP ended up as Appendix Q to the final Environmental Impact Statement/Environmental Impact Report. Appendix Q is included in the record. It states that the six volume SYP/HCP is incorporated by reference. Appendix Q is a "crosswalk" of the key components of the SYP/HCP. The closest Appendix Q comes to the promise Avidity claims is a table entitled "Inventory, Growth, and Harvest Volume Estimates." It shows an estimated harvest for Period 1 (an undefined period) as "1,761,516 mbfn/Decade."

The fact that CDF approved a plan that would allow a certain maximum rate of timber harvesting in no way constitutes an assurance by CDF that the landowner would be able to harvest at that rate. Approval of the SYP is simply an acknowledgement that the plan complies with the Forest Practice Rules and that the plan will permit a certain annual rate of harvest. But, as CDF was careful to point out in its approval letter, the permitted amount was the "*maximum* amount" allowed. (Italics added.) This cannot be construed as an unqualified approval by the State that Pacific Lumber could harvest that amount. As CDF made clear in the Approval Letter, the harvest volume in the SYP was

19

a "limitation[,]" there was a "possibility of further constraints on harvesting based on site-specific analysis[,]" and Pacific Lumber would be "required to submit Timber Harvest Plans (THPs) to CDF" which would be "subject to environmental review under the California Environmental Quality Act (CEQA)."

c. The HCP

Avidity claims that the HCP, to which the damages waiver applies, included adaptive management provisions allowing the HCP to be implemented in a manner sensitive to Pacific Lumber's economic concerns and that committed the state to consider Pacific Lumber's operations needs. In fact, the HCP did allow the use of adaptive management. The HCP explains that its effectiveness will be assessed to determine whether, over time, management of the aquatic habitat is maintaining or achieving proper functioning. The HCP provided that the following circumstances would warrant a change in the plan: (1) the plan is not substantially moving the aquatic habitat toward achieving properly functioning habitat conditions; (2) a more cost-effective technique exists to attain the same outcome; (3) Pacific Lumber can gain flexibility in the prescriptions and still attain the same conditions; and (4) adaptive management will ensure that the plan maintains or achieves the goal of a properly functioning aquatic condition.

The HCP provided that the wildlife agencies (which included CDF and the Department of Fish and Game) would approve Pacific Lumber's proposed changes under adaptive management, as long as they were not in conflict with Assembly Bill 1986, the legislation authorizing the Agreement, and would not impair the ability to maintain or achieve properly functioning aquatic habitat conditions.[13] However, while the adaptive

---

[13] Assembly Bill 1986 is the legislation authorizing the purchase of Pacific Lumber's property, appropriating funds for that purpose, and imposing mitigation measures to

20

management provisions in the HCP were sensitive to Pacific Lumber's economic concerns, they did not provide assurances that Pacific Lumber could harvest at a particular level.

Avidity's claim that the HCP "committed the State to consider [Pacific Lumber]'s operational needs and a cost-benefit analysis to 'determine whether the benefits of protective measures being implemented by [Pacific Lumber] in the field are proportional to the costs to the company' " are not quite accurate. The HCP merely stated that cost-benefit effectiveness studies are needed to make such a determination, and that such studies could identify alternate approaches that would cost Pacific Lumber less. Again, the State did not commit to assure Pacific Lumber could operate at a lower cost.

In fact, evidence was adduced that Pacific Lumber attempted to negotiate an override in the HCP that would guarantee it a certain harvest level, but the federal government would not agree to an override at any level.[14] Thus, while the state and federal governments attempted to build flexibility into the HCP which might have allowed Pacific Lumber to harvest at the maximum level predicted, there was no agreement to any particular harvest level. Furthermore, the HCP is subject to the damages waiver, so breach of any of its terms would not be a basis for a breach of contract cause of action.

---

counteract the effects of Pacific Lumber's logging operations. (*EPIC, supra*, 44 Cal.4th at p. 474.)

[14] David Hayes, who was the lead negotiator for the United States in the Headwaters negotiations, testified in his deposition that Pacific Lumber negotiators were looking for an override to the HCP. "As I recall, they were requiring -- were saying that they needed to have a guaranteed harvest of X number of board feet and that they wanted the HCP to either guarantee them that amount of board feet or, if that amount of board feet could not be produced, the HCP would be back to the drawing board, something to that effect." Hayes was asked if the federal government ever agreed to an override at that level. He replied, "No. We would not agree to an override at any level -- a per se override. This was a science-based Habitat Conservation Plan. It was designed to protect the species."

d.  The Implementation Agreement

As indicated, the Implementation Agreement was entered into between various federal agencies, CDF, the Department of Fish and Game, and Pacific Lumber.  The Implementation Agreement was executed for the purpose of implementing the HCP, and to describe the remedies for failing to perform any obligations under the HCP and the Implementation Agreement.  As indicated, the Implementation Agreement expressly excluded from such remedies any liability for damages.  As there can be no breach of contract cause of action for a violation of any term of the Implementation Agreement, we need not further search its terms for a promise of a certain harvest level.

e.  The Approval Letter

Avidity argues that the March 1, 1999, letter from CDF approving the SYP (the Approval Letter) is "arguably . . . the most important part of the Headwaters Agreement . . . ."  Avidity argues that the letter approved Pacific Lumber's use of SYP alternative 25, which specified a harvest level of 176.2 million board feet per year.  Avidity claims the March 1, 1999, letter gave Pacific Lumber the right to harvest 176.2 million board feet of timber in the first decade of the Agreement.  Not so.  The letter finds that alternative 25 to the SYP is "in conformance with Forest Practice Rules . . . ."  Alternative 25 is not in the record; however, *EPIC* stated that under alternative 25, "the long-term sustained yield was set at 190 mmbf [(million board feet)] per year, and the projected conifer harvest level in the first decade was 178.8 mmbf [(million board feet)] per year – similar to the projections found in appendix Q to the final EIS/EIR [(Environmental Impact Statement/Environmental Impact Report)]."  (*EPIC, supra*, 44 Cal.4th at p. 476.)  Alternative 25 "was based on assumptions about results of the required watershed analysis that were more optimistic" than the alternative previously approved by CDF.  (*Ibid.*)

Assuming the language of the Approval Letter finding alternative 25 "in conformance with Forest Practice Rules" can be read as approval of alternative 25, this

22

does not constitute an agreement on the part of the State that Pacific Lumber was assured the right to harvest at that level. As earlier noted, the letter itself stated that CDF's finding was subject to the conditions described in the letter, and specifically stated that the volume described in alternative 25 was a "limitation[,]" was "the maximum amount of volume[,]" and that further constraints were possible. Thus, the March 1, 1999, Approval Letter cannot be construed as a right to harvest at a certain level.

Avidity also claims there was a signed agreement that the State "expected" Pacific Lumber to harvest 176.2 million board feet, not that this figure was the maximum harvest expected. However, the record pages cited by Avidity for this statement do not contain any such agreement. We need not consider a party's statement that is unsupported by proper reference to the record. (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 827, fn. 1.) We also do not view any state policy encouraging maximum sustained yield levels of timber harvest to constitute an agreement assuring Pacific Lumber it could harvest at a particular level.

2. The Referee's Recommendation

Avidity finally makes a brief reference to the referee's recommendation, and claims that it disproves the State's theory that there was no evidence to support a contract claim. We therefore turn to the referee's recommendation.

The following were set forth by the referee as a "non-exclusive list of statements, which either contain the alleged express promises or may support a finding of similar implied promises . . . ."

a. From the Implementation Agreement:

i. "The purpose of this Section 6.2.3 is to provide Pacific Lumber 'No Surprises' like assurances consistent with [Department of Fish and Game] regulations given the conservation and mitigation measures provided pursuant to the HCP and other relevant factors." The "no surprises" assurances are provisions that limit in advance Pacific Lumber's obligation to mitigate various impacts on endangered and threatened species.

23

(*EPIC, supra*, 44 Cal.4th at p. 507.) *EPIC* held that the "no surprises" clause in Pacific Lumber's ITP were inconsistent with state law. (*Id*. at p. 506-514.)

ii. "[Department of Fish and Game] further agrees that unless [Pacific Lumber] otherwise consents, Attachment No. 4 to the HCP contains the complete and exclusive list of conservation and mitigation measures and planned response that may be required of [Pacific Lumber] to respond to each Changed Circumstance."

iii. "If additional conservation and mitigation measures are deemed necessary by [Department of Fish and Game] to respond to a Changed Circumstance and such measures were not provided for pursuant to the HCP, [Department of Fish and Game] will not require any new, additional or different conservation and/or mitigation measures from [Pacific Lumber] in addition to those provided for pursuant to the HCP without the consent of [Pacific Lumber]."

iv. "The purposes of [the Implementation] Agreement are (1) to ensure implementation of each of the terms of the HCP; . . . and (3) to provide long term assurances to [Pacific Lumber] that as long as the terms of the HCP, the Federal Permit, the State Permit and this Agreement are fully performed, no additional conservation or mitigation will be required of [Pacific Lumber] to minimize and mitigate the impacts of the Take of the Covered Species on the Covered Lands except as provided in the HCP and this Agreement or required by law."

v. "[Pacific Lumber] is agreeing to substantial commitments of land, natural resources, money and other property for the conservation of the Covered Species and their habitats, and is agreeing to other substantial restrictions on the use of the Covered Lands based on the assurances provided by the Agencies in this Agreement."

vi. "These commitments would not have been made by [Pacific Lumber] but for the assurances of the Agencies provided in the HCP and this Agreement."

The above statements are apparently cited by Avidity in support of its argument that the State, in particular the Regional Water Board, had no authority under the

24

Agreement to require additional or different conservation or mitigation measures, and that by requiring such measures, it breached the Agreement.

b. From a March 1, 1999, letter to Pacific Lumber from the United States Fish and Wildlife Service and the National Oceanic and Atmospheric Administration, which was agreed to in part by CDF and the Department of Fish and Game (the Letter Agreement), the referee cited the following:

i. "The HCP includes an adaptive management provision that explicitly takes economic factors into account."

ii. "The provision allows [Pacific Lumber], at any time, to propose changes that are consistent with Assembly Bill 1986 to any of the plan's prescriptions based on information which may be related to the cost effectiveness of particular measures or to [Pacific Lumber]'s ability to choose among equally effective prescriptions."

iii. "In applying the adaptive management provision, the Services will be guided by the [Endangered Species Act] permit issuance criteria, and to the extent changes proposed by [Pacific Lumber] will not result in jeopardy, the Services will consider their practicability, which includes cost to [Pacific Lumber] and economic feasibility and viability."

iv. "Finally, we point out that the project evaluated by the Services in their joint biological opinion assumes a harvest volume of 176.2 mmbf/yr [(million board feet per year)] over the first ten years of the permit, the volume identified in Appendix Q of the Final Environmental Impact Statement/Environmental Impact Report."

These statements relate to Avidity's argument that State promised Pacific Lumber it could harvest an average of 176.2 million board feet per year, because this was the level that was acceptable to Pacific Lumber.

c. The referee's report and recommendation also includes the following statement, which it claims is taken from the Implementation Agreement, the March 1, 1999, Approval Letter, or the March 1, 1999, Letter Agreement:

25

i. "On March 1, 1999, CDF approved [Pacific Lumber]'s Sustained Yield Plan (SYP) with a maximum harvest volume limitation of 176.2 million board feet per year for the first decade."

In fact, this statement is a quote from the referee's own report. The report cites the March 1, 1999, Approval Letter as the source. The particular sentence quoted is not in the Approval Letter. Rather, the Approval Letter stated:

> "The harvest volume limitation in the SYP *is the maximum amount of volume that may be harvested*, based on a ten year rolling average. This volume reflects a range of outcomes that would be generated by prescriptions contained in the HCP during the first ten years covered by the SYP. *It is recognized that the range of outcomes also includes the possibility of further constraints on harvesting based on site-specific analysis*.
>
> "Pursuant to this SYP, [Pacific Lumber] will be required to submit Timber Harvesting Plans (THPs) to CDF. These plans will be reviewed for conformance with the Forest Practice Rules and will be subject to environmental review under the California Environmental Quality Act (CEQA)." (Italics added.)

First, to the extent the Implementation Agreement or HCP contain any express or implied agreement to assure Pacific Lumber economic viability, or entitlement to a certain harvest level, or exemption from water quality laws, the trial court was correct in concluding Pacific Lumber can claim no damages as a result of any express or implied promise in the Implementation Agreement or HCP because of the express waiver of damages. This means none of the statements in 2. a., above, are actionable.

Second, although the statements from the March 1, 1999, Letter Agreement indicate a willingness on the part of the government entities to work with Pacific Lumber to allow it to harvest the maximum amount possible in the circumstances, the language cannot be interpreted as either an express or implied assurance to Pacific Lumber of a certain harvest level, of economic viability, or of an exemption from further environmental review. Even if we could construe them as such, the Letter Agreement

stated that its purpose was to address concerns with the administration of the HCP, and that it served to "clarif[y] certain aspects of the HCP in the Implementation Agreement . . . ." As previously stated, both the HCP and the Implementation Agreement are subject to the damages waiver. The Letter Agreement, which was for the purpose of clarifying those documents, could not confer a separate promise unencumbered by the damages waiver.

Third, the statements in the March 1, 1999, Approval Letter from CDF, written the same day as the Letter Agreement, clarify that the harvest volume allowed by the SYP is the maximum volume that could be harvested, that there could be further constraints on harvesting, and that there would be further environmental review.

Finally, we do not find an agreement to assure Pacific Lumber a minimum harvest level when there is no explicit agreement to that effect in any of the documents making up the Agreement. The parties were sophisticated players with knowledgeable legal counsel engaged in high-profile negotiations. We have no doubt they knew how to draft a provision assuring a minimum harvest level and foreclosing any further regulatory review if that was their mutual intent. That they did not draft such a provision is a clear indication there was no mutual agreement on the issue, and we will not cobble together such an agreement from miscellaneous provisions in the documents tendered in this action.

## III
### Breach of the Covenant of Good Faith and Fair Dealing
### Rests upon the Existence of a Specific Contractual Obligation, and There Was None

Avidity alleged in its complaint that defendant has "defaulted on its obligations, unfairly interfered with Pacific Lumber's right to receive the benefits of the contract, and materially breached its obligation to act fairly and in good faith toward Pacific Lumber . . . ."

27

The complaint alleged in part that the Regional Water Board delayed a hearing for the approval of WDR's which were necessary for the approval of Pacific Lumber's THP's. The complaint alleged that the Regional Water Board's actions were designed to delay Pacific Lumber's operations. Avidity argues that in order for Pacific Lumber to harvest at the rate it expected under the Agreement, defendant had to consider Pacific Lumber's THP's in a timely manner, and that the delay in processing the THP's denied Pacific Lumber the contemplated benefits of the Agreement.

To the extent Avidity argues the State breached the implied covenant of good faith and fair dealing by failing to allow Pacific Lumber to harvest at the rate of 176.2 million board feet per year, we may disregard the claim as superfluous since it relies on the same alleged acts and seeks the same relief claimed in Avidity's breach of contract cause of action. (*Bionghi v. Metropolitan Water Dist.* (1999) 70 Cal.App.4th 1358, 1370.)

However, Avidity argues that in order to achieve its expected harvest, the State had to consider its THP's in a timely manner, but instead the State delayed and the Water Board obstructed the processing and approval of the THP's. Defendant agrees that the heart of Avidity's implied covenant claim is the expectation that a certain number of THP's would be approved within a certain period of time. In response to this basis for claiming breach of the covenant of good faith and fair dealing, defendant argues that the very terms Avidity seeks to imply into the contract are terms that were rejected during negotiations between the parties. Quoting *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 804, defendant argues, that before we may enforce an implied covenant, " 'it must appear from the language used that [the promise] was so clearly within the contemplation of the parties that they deemed it unnecessary to express it' and 'it can be rightfully assumed that [the promise] would have been made if attention had been called to it.' "

"The implied promise [of good faith and fair dealing] requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits

28

of the agreement." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818.) "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153.)

Although breach of a specific provision of the contract is not a necessary prerequisite to a claim of breach of the implied covenant, "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373, (*Carma*).) "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684, 689–690.) 'The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' (*Id.* at p. 690.)" (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031-1032.)

The implied covenant of good faith and fair dealing does not impose substantive terms and conditions beyond those to which the parties actually agreed. (*Guz v. Bechtel National Inc., supra*, 24 Cal.4th at p. 349.) "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.* [Citation.] The covenant thus cannot ' "be endowed with an existence independent of its contractual underpinnings." ' [Citations.] It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Id.* at pp. 349-350.)

As recognized in *Carma, supra*, 2 Cal.4th at p. 373, it is "a simple matter to determine whether given conduct is within the bounds of a contract's express terms. . . .

29

Difficulty arises in deciding whether such conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations." Fortunately in this case, the record contains evidence relative to the parties' legitimate expectations in the form of contract terms that were proposed, but not included in the final agreement.

Relative to whether the parties contemplated an agreement on the timely approval of THP's, it is undisputed that Pacific Lumber attempted, but failed to insert the following language into the Agreement:

"e. As a result of transfer of the Headwaters Forest by Pacific Lumber to the United States, together with the Preserved Elk River Property retained by the United States, acknowledgement by the United States and California that *there is no need for other mitigation for any present or future timber-related activities on the Resulting Pacific Lumber Timber Property*, same to be evidenced by written instruments in form and substance satisfactory to Pacific Lumber.

"f. The United States and California providing written assurances to Pacific Lumber that *the approval of any otherwise lawful timber harvest plan filed by Pacific Lumber* or its assignees with respect to the Resulting Pacific Lumber Timber Property will not be denied, restricted *or otherwise delayed* by reason of any law or rule of law, or any judicial or administrative interpretation thereof, of the United States or California, or any subdivision thereof, with respect to habitat, critical habitat, threatened or endangered species or similar matters, all such assurances to be in form and substance satisfactory to Pacific Lumber.

"g. The United States and California providing Pacific Lumber with instruments in form and substance satisfactory to Pacific Lumber wherein the United States and California agree to use their best efforts and take all necessary and appropriate actions to *cause each timber harvest plan with respect to the Resulting Pacific Lumber Timber Property to be approved by the applicable agency or authority within ___ days after such plan is filed by Pacific Lumber*." (Italics added.)

As Robert Baum, who was involved in the negotiations on behalf of the United States, testified in his deposition, "we weren't going to negotiate along those lines." Baum admitted that they agreed to work with Pacific Lumber and their biologists to come up with an acceptable HCP, but that they would not agree to Pacific Lumber's language.

30

It is also undisputed that a few days before the Agreement was executed, Pacific Lumber proposed including in the Agreement a requirement that the parties agree to THP language. This provision was not included in the executed Agreement. Importantly, the parties agreed in the executed Agreement to use their best efforts "to achieve expedited development and submission . . . and processing . . . of an [ITP]" and an SYP. They also agreed to certain procedures with regard to the development of an HCP, including that the HCP would be subject to the Department of the Interior's "No Surprises" policy.[15] A "no surprises" clause limits in advance the obligation to mitigate various impacts on endangered and threatened species. (*EPIC, supra*, 44 Cal.4th at p. 507.) The Agreement provided that the United States Fish and Wildlife Service and the National Marine Fisheries Service would "expedite" consideration of an ITP and decide on Pacific Lumber's application for an ITP "as soon as practicable. . . ." The Agreement also provided that the State would "expedite" consideration of an SYP, and that the State would "use its best efforts to review and approve the SYP." There was no similar language regarding the contents or procedure for consideration and issuance of a THP.

The evidence thus indicates that the wording and timing of the approval of THP's was a subject of negotiation between the parties, but that the governmental entities did not agree to Pacific Lumber's proposals on that score. Therefore, the parties did not contemplate as a part of the contract that Pacific Lumber's THP's would not require further mitigation, that the State would assure timely approval of Pacific Lumber's THP's, or that the THP's would be approved within a certain number of days. The implied covenant of good faith and fair dealing cannot be extended to create an obligation not intended by both parties. (See *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094 (*Pasadena Live*).)

---

[15] As indicated in part II A, the terms of the HCP are subject to the damages waiver.

31

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." (*Carma, supra*, 2 Cal.4th at p. 372.) In such cases, the covenant will be implied when one party is given absolute discretion over whether or not to perform. (*Third Story Music, Inc. v. Waits, supra*, 41 Cal.App.4th at p. 803.) The benefits of the contract in such cases equal the performance of the other party's obligations under the contract. Courts imply a covenant of good faith and fair dealing in such contracts to create a binding contract in the face of a claim that the contract is illusory. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 57.) However, no covenant of good faith and fair dealing is imposed where the contract is adequately supported by adequate consideration regardless of the discretionary power. (*Ibid.*)

The two cases on which Avidity primarily relies are cases involving the discretionary power of one party to perform its part of the bargain.

In *Pasadena Live, supra,* 114 Cal.App.4th at p. 1094, the agreement provided that the plaintiff would pay for improvements to a city-owned amphitheater, and in return the city would give the plaintiff credit against the license fees paid to the city for plaintiff's productions. In this manner, plaintiff had the opportunity to recoup its investment. (*Id.* at p. 1093.) The agreement expressly provided that the city would not promise or guarantee that it would approve the plaintiff's applications. The court held that the city could not refuse to consider the plaintiff's proposals without violating the covenant of good faith and fair dealing. (*Ibid.*)

*Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354 (*Locke*), involved a contract between a film director and Warner Brothers studio. The contract provided for a " 'first look' " deal in which the director would, for an annual fee, submit any picture she was interested in developing to Warner before submitting it to any other studio. (*Id.* at p. 358.) The contract also provided the studio could either use the director's services, or pay the director an agreed upon sum. (*Ibid.*) The director adduced evidence that the

studio breached the agreement by refusing to consider any of her proposed projects. The court held that "when it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of *honest satisfaction* is applicable." (*Id*. at p. 363.) The court concluded that the evidence raised a triable issue as to whether the studio breached its agreement by not considering the director's proposals on their merits. (*Id*. at p. 364.)

Both of these cases involved agreements where the performance of one party's obligation (i.e., waiving license fees, or producing movies) was dependent on that party's own discretion. The holding in both cases was that the party whose performance was discretionary could not completely and arbitrarily withhold its discretion. Thus in *Pasadena Live, supra*, 114 Cal.App.4th 1089, the court stated that the plaintiff should have had the opportunity to submit production proposals, but that the city had barred plaintiff's submissions. (*Id*. at p. 1093.) Likewise in *Locke, supra*, 57 Cal.App.4th 354, the court held that the plaintiff had adequately alleged that the studio deprived Locke of the benefit of her bargain by refusing to consider her proposals. (*Id.* at p. 363, fn. 3.)

These cases are dissimilar from the one before us in two ways. First, the essential part of State's performance under the Agreement was not the approval of THP's, but the payment of a significant amount of money and timberland. These payments were not subject to the State's discretion. As stated, no covenant of good faith and fair dealing is imposed where the contract is adequately supported by adequate consideration regardless of the discretionary power. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc., supra*, 100 Cal.App.4th at p. 57.)

Second, the parties attempted to describe the limits of Pacific Lumber's ability to harvest its remaining lands by adopting certain long-range environmental documents. By all accounts the specific terms of these documents were negotiated in minute detail. Not only did the parties fail to include any obligation on the part of the State to approve

33

Pacific Lumber's THP's in any particular time frame, there was evidence Pacific Lumber wanted such an agreement but was unable to obtain it.

Before an implied covenant may be imposed: " ' "(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract." ' [Citations.]" (*Third Story Music, Inc. v. Waits, supra,* 41 Cal.App.4th at p. 804.) We cannot assume that the State would have promised to approve Pacific Lumber's THP's in a timely manner if its attention had been called to the issue, when there is evidence that the issue was actually considered and rejected as part of the agreement. Pacific Lumber could have had no justifiable expectations in that regard. Also, there is no legal necessity to imply such a covenant because the agreement is otherwise supported by adequate consideration and is not illusory.

IV
Promissory Estoppel Applies
Only When Consideration is Lacking

In the third cause of action, Avidity alleged that Pacific Lumber reasonably relied on various promises and assurances made by defendant to Pacific Lumber's detriment. Specifically, "Pacific Lumber agreed to significant limitations on its conduct of timber operations in reliance upon Defendant's promises that Pacific Lumber would be allowed to harvest as provided under the HCP and SYP."

The trial court granted summary judgment on this cause of action because it concluded that promissory estoppel is not applicable unless no actual consideration was given by the promisee. It found "plaintiffs' agreement to submit to significant regulatory

34

limitations on the conduct of its timber operations was a critical part of the exchange of promises between the parties that was memorialized in the Headwaters Agreement and the closing documents.  As alleged in the breach of contract cause of action, it was the performance that defendant requested and bargained for in exchange for its alleged promise to provide regulatory assurances that plaintiffs could harvest at an economically viable level, and thus constituted consideration for defendant's promise."  Because the complaint alleged consideration for the defendant's alleged promise, promissory estoppel is inapplicable.  We agree.

Promissory estoppel is a doctrine which binds a promisor if the promisor should reasonably have expected a substantial change of position in reliance on the promise, and if injustice can be avoided only by the enforcement of the promise.  (*Youngman v. Nevada Irrigation Dist*. (1969) 70 Cal.2d 240, 249.)  "The purpose of this doctrine is to make a promise binding, under certain circumstances, *without consideration in the usual sense of something bargained for and given in exchange*.  If the promisee's performance was requested at the time the promisor made his promise and that performance was bargained for, the doctrine is inapplicable."  (*Ibid*., italics added.)  "In other words, where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel."  (*Healy v. Brewster* (1963) 59 Cal.2d 455, 463.)

Avidity's promissory estoppel cause of action alleged that Pacific Lumber acted in reliance on certain alleged promises when it agreed to significant limitations on its conduct of timber operations.  In its breach of contract cause of action, Avidity alleged that Pacific Lumber's duties under the Agreement were to accept substantial restrictions on its conduct of timber operations, as well as to dismiss pending litigation and to transfer the Headwaters Forest to the United States.  Because Pacific Lumber's reliance in accepting substantial restrictions on its conduct of timber operations, in dismissing pending litigation, and in transferring the Headwaters Forest was bargained for, it was

35

consideration for the promises made by defendant, and the doctrine of promissory estoppel is inapplicable.

Avidity argues its promissory estoppel claim is alternative to its breach of contract cause of action, and that it is asserting that the State's promises can be enforced even if we determine that the promises of harvest-level certainty were not supported by consideration. However, our conclusion is that promises of harvest-level certainty were never made, not that they were unsupported by consideration on the part of Pacific Lumber. There is no question that Pacific Lumber gave consideration for the Agreement by agreeing to limitations on the conduct of its business, and by transferring the Headwaters Forest to the United States.[16] Avidity's claim of promissory estoppel fails because the reliance it claims was bargained-for consideration under the Agreement.

## DISPOSITION

The judgment granting the summary judgment motion is affirmed. Respondent shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


    BLEASE    , Acting P. J.


We concur:


    ROBIE    , J.


    DUARTE    , J.

---

[16] Because we conclude summary adjudication of the promissory estoppel cause of action was correct on the ground Pacific Lumber's reliance was a bargained-for exchange, we do not address defendant's additional arguments that promissory estoppel does not apply to future exercises of police power and the alleged promise was not clear and explicit.